Filed 6/12/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re Marriage of FREDERICK W. and MARY KATE WILLIAMSON. | 2d Civil No. B238067 (Super. Ct. No. 1306622) (Santa Barbara County) |
| FREDERICK W. WILLIAMSON II, Respondent, v. MARY KATE WILLIAMSON, Appellant. | |

Frederick W. Williamson II is the son of a wealthy Los Angeles patrician family. Through his parents' generosity, Frederick and his wife, Mary Kate Williamson, enjoyed a lavish, high society lifestyle during their 20-year marriage.[1] When the parties separated, their monthly expenses averaged $45,000, yet they had no employment income. Based on Frederick's post-separation annual income of $99,000, the trial court ordered him to pay monthly permanent spousal support of $2,000 and child support of $1,235.

The principal issue before us is whether the trial court abused its discretion by declining to treat historical cash advances from Frederick's parents as income in

---

[1] "As is customary in family law proceedings, we refer to the parties [and parents] by their first names for purposes of clarity and not out of disrespect. [Citations.]" (*Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1136, fn. 1.)

calculating child and spousal support. The trial court determined they were loans and therefore excludable as income under the child support statutes. Because the advances are to be deducted from Frederick's expected inheritance, we conclude they were gifts in lieu of a devise or inheritance, rather than loans. This distinction is immaterial, however, because the advances ceased before trial and there was no evidence they would resume. Recognizing it could not order Frederick's parents to make further cash advances, the court reasonably concluded it could not base an enforceable child or spousal support order on them.

Mary Kate also contends the trial court erred by retroactively modifying Frederick's temporary support obligation, by failing to correct its statement of decision, by preventing certain discovery, by declining to impose sanctions for breaches of fiduciary duty and by limiting her attorney fees to $10,000. We agree the court exceeded its jurisdiction by charging temporary support payments to the community, rather than to Frederick. We reverse and modify the judgment to correct this error, and affirm in all other respects.

FACTS AND PROCEDURAL BACKGROUND

Frederick and Mary Kate were married in 1989 and have three children. They separated in 2009. Frederick petitioned for dissolution. At the time of trial, only their youngest child, Hughes, was a minor. Hughes will turn 18 in July 2014.

*Pre-Separation Income and Lifestyle*

Before marriage, Mary Kate worked as a salesperson at an Ann Taylor store. She did not complete college. After they married, the parties agreed Mary Kate would stay home and care for their children. With a few exceptions, the marital income came from three sources: Frederick's employment income, his trust income and gifts or cash advances from his parents, Norman and Victoria Williamson.

Frederick's paternal grandmother, Ruth Chandler von Platen, was the daughter of Harry Chandler, a real estate magnate and former publisher-owner of the *Los Angeles Times.* Frederick worked for that newspaper between 1990 and 2005, earning approximately $120,000 per year. He also received annual distributions of approximately

2

$12,000 to $13,000 from the Ruth Chandler von Platen Trust No. 2 (von Platen Trust), his grandmother's testamentary trust.

Frederick's parents made annual tax-free gifts of $26,000 to Frederick, Mary Kate and each of their children, for a total of $130,000 per year. They also paid the children's private school tuition. After selling one of their properties in 2000, they gifted Frederick and each of his siblings $900,000. Frederick and Mary Kate used that money, in part, to purchase stock, art and antiques.

Frederick's parents also advanced money to purchase and remodel the parties' homes. In 1991, Norman advanced them $395,000 to purchase a home on Old Mill Road in Pasadena. He forgave that "loan" because it was their first home. A few years later, Frederick and Mary Kate sold that property and purchased a "fixer" home on Huntington Circle in Pasadena for $899,000. Known as "Harton Hall," the historically significant, 7,000 square-foot residence was on the grounds of the Ritz Carlton Huntington Hotel, providing the family with access to the hotel's tennis courts, swimming pool, gym, spa facilities and room service. Norman advanced the parties approximately $1,205,600 to purchase and renovate the property.

Frederick and Mary Kate drove luxury automobiles and had a full-time housekeeper. They belonged to several exclusive private clubs, including The California Club, The Valley Hunt Club and The Pasadena Athletic Club. They travelled frequently, both internationally and domestically, sometimes by private jet. During ski season, the family spent most weekends at Mammoth Mountain. Mary Kate shopped at high-end stores, purchasing designer jewelry, clothes, handbags and shoes. Frederick collected fine wine.

The parties regularly visited the family's luxury beachfront home in Carpinteria, known as "Sandyland." Frederick inherited a 1/11th interest in the property, which is co-owned by his siblings and cousins. The interest was deeded to Frederick from Ruth Chandler von Platen's estate, along with a 1/12th interest in an adjacent empty lot. The various owners, including Frederick, coordinate use of Sandyland, which is

3

never rented and does not generate income. Frederick's father and uncle pay the property's expenses.

When they decided to relocate to Santa Barbara, Frederick and Mary Kate sold Harton Hall for $3,430,000. They used the equity from that property, along with a $340,000 advance from Norman, to purchase a home on Featherhill Road in Montecito (Featherhill) for $2,750,000. They also purchased a vacation home in Mammoth for $575,000.

Featherhill had a main residence, guest house, pool and pool house, garage and studio, but required extensive repairs. The parties planned to tear down the structures and rebuild. When that proved infeasible, they embarked on a complicated renovation. As spending on the project spiraled, Frederick liquidated $470,000 in stock inherited from his maternal grandmother. He also quit his job at the *Los Angeles Times* to focus on the renovation.

During the final two years of the marriage, Frederick obtained large sums of money from his parents to help pay for the renovation. The parties' monthly expenses ranged between $40,000 and $50,000. Frederick and his father had "many heated conversations about whether they would continue to lend [the couple] money." Norman maintained a spreadsheet on which he kept track of the cash advances made to Frederick and his siblings. The advances to Frederick and Mary Kate totaled approximately $2,168,055, including interest. Mary Kate always thought the advances were gifts. She never heard them referred to as "loans" or "advancement[s] on inheritance" until the divorce. She said, "Everybody in the family just gets money when they need it."

No portion of the cash advances has been repaid. Two weeks before trial, Norman and Victoria made a revocable amendment to their 1992 trust. According to Norman, it "was a clarification of [their] intent" that any loan balances and accrued interest due and owing by Frederick or his siblings at the time of distribution will be subtracted from that child's portion of the inheritance.

4

*Post-Separation Income and Lifestyle*

After the parties separated, Mary Kate and the children continued living at Featherhill. Frederick rented a one-bedroom, basement apartment for $1,800 per month. He stayed there for approximately 18 months. When Norman refused to help with the rent, Frederick moved into his parents' home in Montecito. He planned to live there until escrow closed on Featherhill.

For a period after separation, Norman voluntarily paid Mary Kate $8,600 a month. When he terminated those payments, Mary Kate moved for a temporary spousal and child support award. Pending a final hearing on her request, the court ordered Frederick to pay monthly spousal support of $5,000 and child support of $5,000.

In the meantime, the parties sold Featherhill and placed the $1,378,067 in sale proceeds in a blocked account. Claiming his parents were no longer advancing him money, Frederick requested leave to pay support from the blocked account. The parties agreed to deduct the September and October 2010 support payments from that account and to charge them to Frederick as an early distribution of his share of community assets. Subsequently, the trial court set temporary spousal support at $13,450 per month and child support at $7,950 per month, retroactive to July 2010. The order specified the payments for support "shall be paid from the parties' blocked account . . . until that account is exhausted."

In October 2010, Frederick began working as the manager of the *Santa Barbara News Press* classified advertising department. His annual salary was $45,000 plus $15,000 in commissions. He continued to receive $13,000 per year from his grandmother's trust and another $26,000 from his parents, for total annual income of $99,000.

*Trial and Decision*

Following a seven-day trial, the trial court determined Featherhill was a community asset. It found that "[a]lthough it is likely that the vast majority, if not all, of the funds used to acquire and improve Featherhill were Fred's separate property there is insufficient evidence to trace the funds . . . ." With respect to support, the court observed:

5

"The suspicions that the family would make its wealth available to Fred to pay spousal support before allowing Fred to go to jail for contempt or that Kate is using her one weapon of alienating the children to extort some more money from the Williamson family, although perhaps likely and maybe even the driving forces behind this litigation, are largely irrelevant or unsupported by sufficient evidence on which to make findings."

Norman testified he does not intend to make any further advances or "loans" to Frederick other than the annual $26,000 tax-free gift. He anticipated the loans were no longer necessary because Frederick had become fully employed and self-sufficient. Norman said he would not make any more advances if they were used to pay child or spousal support, although he did plan to continue the annual $26,000 tax-free gifts to Hughes and his siblings.

Mary Kate's expert accountant, Jill Bombino, testified Frederick had between $57,806 and $64,793 in monthly cash flow available for support. The trial court determined her opinion was compromised by her reliance on the testimony of Mary Kate's real estate expert, John Kenny. The court found Kenny "appeared to be unfamiliar with a number of criteria that would seem to be important in placing a value on the properties which substantially compromised the value of his opinions to the court. His testimony was not credible."

Explaining that a fair child support order should reflect the financial standing of the parties as it existed at time of trial, the court looked only to income available for support based on the parties' current earnings and income. It included Frederick's employment and trust income, plus the annual $26,000 tax-free gift, but excluded the historical "loans" from Frederick's parents. The court noted it could not order Norman and Victoria to make further cash advances or gifts to Frederick, and concluded it was entirely speculative whether additional advances would be made.

The trial court found Frederick had monthly income of $8,250 available for child support. It imputed $3,000 in monthly income to Mary Kate, deciding she had the ability to earn approximately $2,185 per month without any training and $4,000 per month with training. The court understood training could take approximately one year,

6

but emphasized she had made no effort to find employment or to train herself in any field prior to trial. The court set child support for Hughes at $1,235 monthly, with 100 percent custody to Mary Kate, to be reduced to $1,136 in six months, with 12 percent custody to Frederick.

The court determined Frederick and Mary Kate enjoyed a lavish, upper income lifestyle but lived well beyond their means. Their lifestyle, the court noted, was unreasonable and artificial given their income. It had been sustained by "loans and annual gifts from [Frederick's] parents that have been reduced to $26,000 to [Frederick] (as opposed to $130,000 for the family during the marriage)," plus inheritances from his grandmothers. Stating both parties would have to live more modestly in the future, the court ordered Frederick to pay permanent spousal support of $2,000 per month.

Given Frederick's greater resources to pay attorney fees, the court awarded Mary Kate $10,000 in attorney fees, "plus additional attorney fees and costs, if any, awarded by post-trial motion." It denied Mary Kate's request for sanctions based on Frederick's initial failure to disclose certain assets.

Both parties objected to the trial court's tentative decision. The court adopted Frederick's proposed statement of decision, which incorporated most of its tentative findings. Mary Kate moved for a new trial and to set aside the judgment, asserting it was legally incorrect and inconsistent with the evidence.

Because the trial judge had retired, the motions were heard by the Honorable Donna D. Geck. In denying the motions, Judge Geck observed the trial judge had meticulously considered the witnesses' testimony and numerous trial exhibits, as reflected in the 40-page statement of decision. She concluded "the decision sets forth a careful and thorough discussion and analysis of the law supporting the Court's decision which need not be reiterated here." Mary Kate appeals.

## DISCUSSION

### Standard of Review

Awards of child support and spousal support are reviewed for abuse of discretion. (*In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1572.) "[W]e do not

7

substitute our judgment for that of the trial court, and we will disturb the trial court's decision only if no judge could have reasonably made the challenged decision. [Citation.]"  (*In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1046-1047.)

In reviewing a child support order, "we are mindful that 'determination of a child support obligation is a highly regulated area of the law, and the only discretion a trial court possesses is the discretion provided by statute or rule.' [Citation.]"  (*In re Marriage of Cryer, supra,* 198 Cal.App.4th at p. 1047.)  "[T]he trial court's discretion is not so broad that it 'may ignore or contravene the purposes of the law regarding . . . child support. [Citations.]' [Citation.]"  (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 283 (*Cheriton*).)

*Child Support*

Trial courts must calculate child support in accordance with the mathematical formula contained in Family Code section 4055.[2]  (*Cheriton, supra*, 92 Cal.App.4th at p. 284.)  This mandatory formula "takes into account both parents' 'net monthly disposable income' (§ 4055, subds. (a) & (b)), which is determined based upon the parents' 'annual gross income' (§ 4058).  Section 4058, subdivision (a), defines 'annual gross income' as 'income from whatever source derived,' and lists more than a dozen possible income sources to be considered as part of annual gross income."  (*In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 731, fn. omitted (*Alter*).)  "Loans" are not included as a possible source.  (§ 4058, subd. (a).)

*In re Marriage of Rocha* (1998) 68 Cal.App.4th 514 held that student loans are not income under section 4058, reasoning that each source of income enumerated in that section was a "form of income where there is no expectation of repayment or reimbursement."  (*Id.* at p. 517.)  Noting that student loans carry an expectation of repayment, the court concluded they do not share "similar features with those specifically enumerated items designed to qualify as income."  (*Id.* at pp. 517-518; see *Auerbach v.*

---

[2] All statutory references are to the Family Code unless stated otherwise.

*Great Western Bank* (1999) 74 Cal.App.4th 1172, 1183, fn. 16 [loans generally not income unless forgiven].)

Here, the trial court found that, except for the annual $26,000 tax-free gifts, the monies advanced by Frederick's parents were loans and thus not includable as income under section 4058. Mary Kate contends this was error. We agree. But, as we shall explain, the error is of no consequence.

Courts are appropriately skeptical of transfers by the parents of one of the parties in a divorce case. "There is an incentive for both sides of the transfer, the parents making it and the litigant receiving it, to conform their testimony to the disadvantage of the other litigant. Transfers where the parents would never have sought repayment, if the marriage had remained intact, may be viewed from a different perspective when the marriage falls apart." (*In re Marriage of Schmidt* (1993) 242 Ill.App.3d 961, 968 [610 N.E.2d 673, 678].) This may explain why, two weeks before trial, Frederick's parents amended their testamentary trust to account for the cash advanced to Frederick during the marriage.

Although Frederick and his father testified the advances were "loans," they do not bear the typical characteristics of a loan. Civil Code section 1912 provides that "[a] loan of money is a contract by which one delivers a sum of money to another, and the latter agrees to return at a future time a sum equivalent to that which he borrowed." (See *Southwest Concrete Products v. Gosh Construction Corp.* (1990) 51 Cal.3d 701, 705 ["A loan of money is the delivery of a sum of money to another under a contract to return at some future time an equivalent amount"].) It is undisputed Frederick has not repaid any of the "loans." Nor is he contractually required to do so.

The trial court found that Frederick's parents intend to deduct the "loans" from Frederick's share of inheritance under their trust. This arrangement suggests an "advancement on inheritance." "By its very definition, an advancement is a gift which is expressly stated by the donor to be a part of the estate which the donee would otherwise receive. Thus, an advancement, by its nature, constitutes a gift in lieu of a devise or inheritance." (*Estate of Garin* (1979) 98 Cal.App.3d 999, 1008; *Estate of Nielsen* (1959)

9

169 Cal.App.2d 297, 301 [advancement is a "gift made by a parent during his lifetime to his children intending that gift to be a part or the whole of that portion of the parent's estate to which the child will be entitled upon the death of the parent"]; see Prob. Code, § 6409.)

Assuming the parental advances were gifts, rather than loans, the question becomes whether they may be treated as income under section 4058. *In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 529-530 (*Schulze*), held that recurring gifts received from the husband's parents, who were also his employers, were "employee benefits" that could be considered as income. But the court declined "to explore further the nature of parental gifts to adult children who themselves have their own support obligations." (*Id.* at p. 530, fn. 10.) It noted the "really tough case . . . would be that of the scion of a wealthy family whose parents are *not* his or her employers and who still manages to live quite well even on a low annual gross income as defined by section 4058 because of bona fide nontaxable *gifts* from his or her parents . . . ." (*Ibid.*) *Alter* was that case.

In *Alter,* the husband's mother provided substantial support to the couple during the marriage. After the divorce, the husband received $6,000 every month from his mother that he claimed was either a loan or a gift and therefore not income for purposes of calculating child support. (*Alter, supra*, 171 Cal.App.4th at p. 731.) The Court of Appeal upheld the trial court's implied finding the payments were gifts because, inter alia, there was no evidence the husband had "ever repaid any of the money." (*Ibid.*) The court concluded: "[N]othing in the law prohibits considering gifts to be income for purposes of child support so long as the gifts bear a reasonable relationship to the traditional meaning of income as a recurrent monetary benefit. But while regular gifts of cash may fairly represent income, that might not always be so. Therefore, the question of whether gifts should be considered income for purposes of the child support calculation is one that must be left to the discretion of the trial court." (*Id.* at p. 737; accord, *Kevin Q. v. Lauren W.* (2011) 195 Cal.App.4th 633, 646-647 [regular monthly monetary gifts from parent constituted income for purpose of determining appellant's ability to pay attorney fees].)

10

Two distinguishing features exist here.  First, aside from the annual $26,000 tax-free gifts and the one-time $900,000 gift in 2000, the cash advances from Frederick's parents were made upon request, depending upon the family's needs.  As Mary Kate explained, "Everybody in the family just gets money when they need it."  In some years, Frederick and Mary Kate needed large sums of cash, primarily to purchase and renovate homes.  In other years, they requested little or no assistance.  In that sense, the advances were irregular and outside "the traditional concept of income as a recurrent, monetary benefit." (*Alter, supra,* 171 Cal.App.4th at pp. 736-737.)

Second, and more importantly, Frederick's parents are no longer making the advances.  The trial court properly characterized the recurring annual tax-free gifts as income, but found "it is speculative to assume that further gifts or loans will be made in the future."  Substantial evidence supports this finding.  Norman testified that aside from the annual gifts, he is no longer advancing funds to Frederick and has no plans to do so now that his son is self-supporting.  Norman also stated he would not provide money for support payments.

Generous relatives do not have a duty to support a family member's minor children.  That duty belongs to the children's parents.  (§ 4053, subd. (b).)  Once gifts to a supporting parent have ceased, without any reasonable indication they will resume, they may not be used to impute income to that parent.  (*Alter, supra,* 171 Cal.App.4th at pp. 736-737.)  Treating such gifts as income would "lead[] to support payments based on money the parent does not have." (*In re Marriage of Schlafly* (2007) 149 Cal.App.4th 747, 758; see *Schulze, supra,* 60 Cal.App.4th at p. 532 ["Nothing showed that [husband] had, or was reasonably likely to have, the 'ability to pay' the $7,500 forthwith except the notion that [his] parents' generosity could be taken for granted"].)  Accordingly, the trial court's decision to exclude the historical parental cash advances as income was within the proper exercise of discretion.

Although Mary Kate claims this decision is unfair, *Alter* observed:  "'[I]f [gift] payments should stop earlier than anticipated by the court, the parent obligated to provide support based on those payments may seek modification of the support order.'

11

[Citation.]"  (*Alter, supra*, 171 Cal.App.4th at p. 736.)  The reverse also is true.  The trial court retained jurisdiction to modify the amount of support "upon a change of Fred's income available for support."

Additionally, Mary Kate contends the trial court erroneously refused to impute income of $7,000 per month to Frederick as the value of rent-free living in his parents' home pending distribution of the Featherhill sale proceeds.  In rejecting this argument, the trial court noted that Frederick's parents also stayed at the home one to two weeks a month, and that rent-free living increased the amount of income available for support.  There was no abuse of discretion.  (See *In re Marriage of Loh* (2001) 93 Cal.App.4th 325, 334 [free housing is not income under section 4058]; *In re Marriage of Schlafly, supra,* 149 Cal.App.4th at pp. 759-760 [same].)

*Spousal Support*

Unlike the statutes governing child support, those governing spousal support do not define income.  (*In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1445.)  In ordering permanent spousal support, "the trial court *must* consider and weigh all of the circumstances enumerated in [section 4320], to the extent they are relevant to the case before it.  [Citations.]  The first of the enumerated circumstances, the marital standard of living, is relevant as a reference point against which the other statutory factors are to be weighed.  [Citations.]"  (*Cheriton, supra,* 92 Cal.App.4th at pp. 302-303, fns. omitted.)  Other relevant statutory factors include the supporting spouse's ability to pay; the needs of each party, based on the marital standard of living; the duration of the marriage; the age and health of the parties; the balance of hardships to the parties; and the goal that the supported party be self-supporting within a reasonable period of time. (§ 4320; *Cheriton*, at pp. 303-304.)

Mary Kate sought permanent monthly spousal support of $28,782.  She contends the award of $2,000 monthly is inadequate because it requires her to live below the marital standard of living.  That standard, however, "is not 'an absolute measure of reasonable need, but merely a "basis" or reference point for determining need and support.'  [Citation.]"  (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 207.)

12

The court must consider all of the relevant statutory factors. (*Cheriton, supra,* 92 Cal.App.4th at pp. 302-304.) After weighing all those factors, the court may "fix spousal support at an amount greater than, equal to or less than what the supported spouse may require to maintain the marital standard of living, in order to achieve a just and reasonable result under the facts and circumstances of the case." (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 475; *Namikas v. Miller* (Apr. 14, 2014, B244685) ___ Cal.App.4th ___ [2014 D.A.R. 5833].)

The trial court agreed Frederick and Mary Kate enjoyed a lavish, upper income lifestyle, but found it was unreasonable and artificial given the parties' personal income. Without his parents' largesse, it simply was not sustainable. A spouse "cannot reasonably demand support at the actual marital standard of living if that standard had itself been unreasonably high under the circumstances." (*In re Marriage of Smith, supra,* 225 Cal.App.3d at pp. 485-486, fn. omitted.) The reality here is that whatever the standard may have been during the marriage -- irrespective of how it was maintained -- without a continuing stream of income, there can be no enforceable support order. Simply put: there is no money. (See *Schulze, supra,* 60 Cal.App.4th at p. 532.)

We decline the parties' invitation to decide, as a matter of first impression, whether transfers from a parent, characterized as either loans or gifts, may be considered in calculating spousal support under section 4320.[3] Spousal support must be established according to the needs of both parties and "their respective abilities to meet these needs." (*In re Marriage of Meegan* (1992) 11 Cal.App.4th 156, 161.) Having found that Norman and Victoria are no longer advancing funds to Frederick, the trial court appropriately based its spousal support order on Frederick's ability to pay, rather than that of his parents. As *Schulze* observed, "[c]harity, once extended, is . . . not an entitlement. Parents are not obligated to pay the costs of their children's divorces." (*Schulze, supra,*

---

[3] As previously discussed, the cases addressing the distinction between loans and gifts have involved child support. (E.g., *In re Marriage of Rocha, supra,* 68 Cal.App.4th at pp. 517-518; *Schulze, supra,* 60 Cal.App.4th at pp. 529-532; *Alter, supra,* 171 Cal.App.4th at pp. 736-737.)

60 Cal.App.4th at p. 532.)  Whether the parental cash stream is characterized as a loan or a gift is irrelevant here.  However characterized, it had ceased.

*Retroactive Reduction of Temporary Support*

The parties placed the proceeds from the sale of Featherhill in a blocked account because they disputed their respective interests in the proceeds.  Among other things, Frederick contended Featherhill was his separate property.  The trial court ordered Frederick to pay Mary Kate temporary monthly child support of $7,950 and spousal support of $13,450, to be deducted from the blocked account "until that account is exhausted.  Thereafter, [Frederick] or his estate shall pay accrued child support at the rate of $1,987 per month and accrued temporary spousal [support] at the rate of $69 per month plus 80% of any distribution to [Frederick] from any person or entity . . . in which [he] or his family members have an[] ownership or beneficial interest . . . ."

Finding Featherhill a community asset, the trial court ordered the sale proceeds to "be divided equally" after reimbursing Frederick for his $339,798 separate property contribution toward its purchase.  (See § 2640.)  The judgment provided the temporary support payments were to be paid from the general community funds in the blocked account, rather than from Frederick's share.  Mary Kate argues this provision retroactively reduced Frederick's pendente lite support obligation by 50 percent, impermissibly requiring her to pay half of her own support.  Frederick responds it was appropriate to charge the community because the order did not expressly require deduction of the payments from his share of the blocked account.  We agree with Mary Kate.

As Frederick concedes, a trial court lacks jurisdiction to retroactively modify a pendente lite support order to any date earlier than the date on which a proper pleading seeking modification of such order is filed, unless it specifically reserves jurisdiction to do so.  (*In re Marriage of Gruen* (2011) 191 Cal.App.4th 627, 631, 638-639 (*Gruen*); *In re Marriage of Freitas* (2012) 209 Cal.App.4th 1059, 1074-1075.)  "A temporary support order is operative from the time of pronouncement, and it is directly appealable.  [Citation.]"  (*Gruen,* at p. 637.)  "'If an order is appealable, . . . and no timely

14

appeal is taken therefrom, the issues determined by the order are res judicata.' [Citations.]" (*Id.* at p. 638.)

Here, it is undisputed the temporary support order was final. The trial court did not reserve jurisdiction over the order and no appeal or request for modification was filed. (See *Gruen, supra,* 191 Cal.App.4th at pp. 637-638.) Consequently, Mary Kate "was entitled to rely on the amount of temporary support ordered without the threat of having to repay or credit [Frederick] with any portion of accrued support." (*Id.* at p. 639.)

When the trial court initially allowed Frederick to make temporary monthly support payments of $10,000 from the blocked account, it appropriately charged those payments to Frederick "as and for a pre-trial distribution of *his portion* of the community estate." (Italics added.) The judgment similarly should have allocated *all* temporary support payments to Frederick's share of the estate. Frederick cites no authority suggesting his support obligation should be charged equally to the parties' community property shares. "'. . . It makes no more sense to reduce wife's spousal support because she received her rightful share of the community property than it would to increase wife's spousal support because husband received his rightful share of the community property. . . .'" (*In re Marriage of Dietz* (2009) 176 Cal.App.4th 387, 398-399.) We conclude the trial court exceeded its jurisdiction by retroactively modifying the final temporary support order to reduce Frederick's support obligation. (*Gruen, supra,* 191 Cal.App.4th at pp. 631, 638-639.) We modify the judgment to correct this error.

### *Statement of Decision*

Mary Kate contends the trial court's 40-page statement of decision was deficient and its failure to correct the deficiencies constituted reversible error. The purpose of a statement of decision is to explain the factual and legal basis for the decision. (Code Civ. Proc., § 632; *Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1125-1126.) The court is required only to state the ultimate rather than evidentiary facts. (*Muzquiz,* at p. 1125; *People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 524, overruled on other grounds in *Cel-Tech Communications, Inc. v.*

15

*Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163.)  The statement of decision "need do no more than state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the trial court in reaching its decision." (*Muzquiz,* at p. 1125.)

There were seven controverted issues before the trial court.  Mary Kate's request for a statement of decision was 14 pages and included 147 questions.  The court was not required to provide specific answers to those questions so long as the statement of decision fairly disclosed its determination of these issues.  (See *People v. Casa Blanca Convalescent Homes, Inc., supra*, 159 Cal.App.3d at p. 525.)  Each of the issues raised in Mary Kate's opening brief was discussed, often at length, in the statement of decision.  As aptly stated by Judge Geck, "the decision sets forth a careful and thorough discussion and analysis of the law supporting the Court's decision."  Nothing more was required.

*Protective Order*

Frederick is a beneficiary of the von Platen Trust, which is one of 18 sub-trusts of the Marian Otis Chandler Trust No. 2.  He receives annual income from the von Platen Trust, but is not a beneficiary of any other Chandler trust or sub-trust.  Mary Kate served subpoenas requesting documents from the various Chandler trusts and partnerships.

The trial court granted Frederick's request for a protective order as to the Chandler trusts, except for the von Platen Trust as it relates to Frederick.  It limited discovery to disclosure of checks paid to Frederick, his income statements and tax returns and "[t]he express terms of the [von Platen Trust] that allocate income to [Frederick] and define his interest in that trust, but redacted to prevent disclosure of third party beneficiaries and contingent beneficiaries, as well as the assets of the trust."  Mary Kate contends the trial court abused its discretion by preventing her from discovering the von Platen Trust's assets and any provisions that might permit the trustee to pay additional sums to Frederick.  We are not persuaded.

16

The von Platen Trust has numerous beneficiaries. Discovery may be limited when the intrusiveness of the request outweighs the likelihood that the information sought will lead to the discovery of admissible evidence. (Code Civ. Proc., § 2017.020, subd. (a).) In weighing the privacy interests of the third party, the trial court should consider the nature of the information sought, its inherent intrusiveness, and any specific showing of a need for privacy, including any harm that disclosure of the information might cause. (*Schnabel v. Superior Court* (1993) 5 Cal.4th 704, 714.) Courts have held that private financial information is worthy of protection in discovery. (E.g., *Hinshaw, Winkler, Draa, Marsh & Still v. Superior Court* (1996) 51 Cal.App.4th 233, 237; *Valley Bank of Nevada v. Superior Court* (1975) 15 Cal.3d 652, 656-657.)

During the parties' 20-year marriage, Frederick received regular annual tax-free distributions of approximately $12,000 to $13,000 from the von Platen Trust. He continues to receive those same distributions. The trial court ordered the von Platen Trust to disclose the specific terms defining Frederick's interest in the trust. Mary Kate does not contend the trust failed to produce that information. Because the record does not include the documents that were produced, we must presume those documents disclosed all information regarding Frederick's interest. Mary Kate has not demonstrated error.

### Breach of Fiduciary Duty

Mary Kate claimed Frederick improperly liquidated a $60,000 Roth IRA account and failed to initially disclose his 1/11th interest in Sandyland, a 401k plan worth $14,990, and Xencor stock worth $5,850. The trial court determined none of these acts constituted a breach of fiduciary duty. Although Frederick improperly withdrew monies from the Roth IRA, he divided the account equally with Mary Kate. The court found the other assets were disclosed to her well in advance of trial, and that she suffered no prejudice from the initial failure to disclose. The record supports these findings.

### Attorney Fees

Mary Kate contends she was denied due process when the trial court ordered Frederick to pay her $10,000 for fees and costs. She claims she had no

17

opportunity to present relevant evidence on the issue before judgment was entered. The record is to the contrary.

At the start of trial, the court explained it generally hears requests for attorney fees and costs "by post-trial motion unless somebody wants to argue it otherwise." Mary Kate's counsel responded, "Okay." Frederick's counsel said, "That would be my preference." The court added, "[I'm i]n a better position usually to evaluate those kinds of motions after the trial so that you're not precluded from bringing the post-trial motion for attorneys' fees in this matter."

The judgment awarded Mary Kate "$10,000 in attorney fees . . . plus additional attorney fees and costs, if any, *awarded by post-trial motion*." (Italics added.) By not filing a post-trial motion for attorney fees, Mary Kate waived the issue on appeal. (See *Ventura v. ABM Industries Inc.* (2012) 212 Cal.App.4th 258, 265 [failure to seek ruling from trial court forfeited issue on appeal].)

DISPOSITION

The judgment is reversed to the extent it provides that the temporary support payments made from the blocked Wells Fargo account are to be charged to the community. We modify the judgment to delete the fourth full paragraph on page 40, at lines 21 through 24, and to state instead: "All monies paid out of the Featherhill proceeds in the parties' blocked Wells Fargo bank account for temporary support shall be charged solely against Petitioner's share of the Featherhill proceeds. All monies paid out of that account for attorney fees shall be charged to the community." In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

CERTIFIED FOR PUBLICATION.


PERREN, J.

We concur:


GILBERT, P. J.

YEGAN, J.

18

James W. Brown, Judge

Superior Court County of Santa Barbara

_____

Law Offices of Marjorie G. Fuller, Marjorie G. Fuller for Appellant.

Hollister & Brace, Paul Adam Roberts, Kevin Nimmons; Honey Kessler Amado for Respondent.