Filed 10/16/15  Marriage of Jeha CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re the Marriage of JACK G. and LORI M. JEHA. | |
| JACK G. JEHA,<br><br>    Appellant,<br><br>v.<br><br>LORI M. JEHA,<br><br>    Respondent. | A143386<br><br>(Contra Costa County<br>Super. Ct. No. D12-00385) |

Upon their separation, Jack G. Jeha (Husband) and Lori M. Jeha (Wife) entered into a marital settlement agreement, through which they agreed Husband's family support payments would be based on the amount of his taxable income.  Although Husband draws a $156,000 salary from his subchapter S corporation, he asserts he has no income available for support because the company is unprofitable and its losses are greater than his salary.  The trial court rejected this claim because Husband's father has covered the business's losses.  Husband now argues the trial court erred in allowing the advances from his father to offset his business losses.  He also challenges the trial court's award of attorney fees to Wife.  We affirm.

## I.  BACKGROUND

### A.  *The Marital Settlement Agreement*

Husband and Wife married in 1995 and separated in 2011.  They executed a marital settlement agreement (MSA) in August 2012, which was later approved by the

court and incorporated into the judgment. The MSA awards Husband and Wife joint legal custody of their four sons.

The MSA contains various provisions concerning family support payments from Husband to Wife, payments providing for both spousal and child support. According to the MSA, Wife has a serious medical condition that limits her ability to work.[1] Husband agreed to make baseline family support payments to Wife in the amount of $5,411 per month until December 31, 2012, and $5,832 per month thereafter. These base payments were calculated through DissoMaster,[2] based on the assumption Husband would earn $39,000 per quarter, i.e., $156,000 per year. Additionally, every quarter, Husband was to make supplemental family support payments consisting of 26.5 percent of the amount by which Husband's gross income exceeded $39,000 for that quarter. For the purposes of calculating family support payments, the MSA defines income as " 'taxable income of any kind from any business, including but not limited to salary, bonuses, and taxable income reported on K-1 forms.' "

The MSA further provides family support payments may be subject to an "annual retroactive true up," which is to be conducted no later than August 15 of every year for the preceding calendar year. The true up allows Husband to recover overpayments in family support if his actual income in a particular year is lower than expected. Likewise, Wife may recover for underpayments if Husband's actual income is higher than expected. The agreement requires a true up to be performed for the year 2012, unless otherwise agreed by the parties. Thereafter, the true up is performed only if requested by one or both of the parties. In calculating the true up, the parties are to engage a mutually acceptable accountant to calculate Husband's annual income. Underpayments or overpayments in one year are reconciled by adjusting the base amount of support paid in the following year. For example, if Husband overpays family support by $2,400 in calendar year 2013, then he may reduce support by $200 per month in 2014.

---

[1] Wife testified she has been diagnosed with multiple sclerosis.

[2] DissoMaster is a privately developed computer program used to calculate guideline child support as required by the Family Code.

**B.** *Husband's Finances*

At issue in this case is the true up for the year 2013, and the last four months of 2012. Specifically, the parties disagreed whether advances to and from Husband, losses incurred by his business, and the salary Husband pays himself from that business should have any impact on Husband's "income," as that term is defined by the MSA.

Husband has owned and operated Plant Hazardous Services, Inc. (PHS), a construction company, since 2005. PHS is a subchapter S corporation, which has the feature of paying no taxes and instead passing through profits and losses pro rata to its shareholders. Husband is the sole shareholder of PHS and pays himself an annual salary of $156,000 through the company.

In recent years, PHS has not been profitable. It had a negative income in 2012 and 2013. In order to keep the business running, pay his salary, and support his family, Husband has taken out sizeable loans. Husband borrowed $733,000 from his father, Ron Jeha (Father)—$433,000 between sometime in 2005 and November 5, 2010, and another $300,000 between September 2012 and March 2014. Father executed a promissory note for $433,000 in November 2010, and later executed a $733,000 deed of trust and assignment of rents, secured by Husband's separate property. On May 28, 2014, a new promissory note was signed, reflecting another $44,000 in loans from Father to Husband. Husband borrowed another $200,000 from Mechanics Bank in December 2012. This loan may also be covered by Father, as he is in the process of negotiating it with the bank. In addition to these loans, at various times, Father has directly paid Husband's expenses, including his mortgage, utilities, and insurance premiums. Since March 2014, Father has made family support payments directly to Wife.

The parties dispute whether the money from Father was a loan or a gift. The promissory note executed by Father indicates there is no deadline for repayment, other than upon demand. Father testified he hoped to get his money back before he died. When asked if he expected to be repaid, Father responded: "If I don't, I don't. . . . he's my son." Father never demanded repayment of his loans to Husband, even when PHS was profitable. He also stated he was unsure whether he would foreclose on Husband's

3

property in the event of default, explaining he only executed the promissory note and deed of trust because he wanted to be "first in line" in the event Husband went bankrupt.

Husband used a portion of the money he borrowed from Mechanics Bank and Father to lend or advance $289,000 to Chris Knapp. Knapp is a demolition and excavation contractor, who is sometimes employed by PHS as a subcontractor. Knapp is also a longtime friend of Husband. Husband claimed Knapp needed the money to complete jobs for PHS, and that PHS could not have hired another subcontractor to perform the work because Husband and Knapp had a "trusting relationship." Not all of the loans to Knapp were related to PHS's business. At one point, Husband loaned Knapp $27,000 to buy a collectible car and " 'flip' it."

## C. *Procedural History*

In September 2013, the parties stipulated to the appointment of Tim Mulgrew to perform the true-up calculations. Mulgrew determined the financial records prepared by PHS's outside bookkeeper were substantially inadequate, and he therefore recreated the accounting records for the time periods in question. In his final report, dated March 12, 2014, Mulgrew found the net income available for support for the period of September 1, 2012 through December 31, 2012 was negative $53,460. For the period of January 1, 2013 through December 31, 2013, Mulgrew found the net income available was negative $44,457. Based on Mulgrew's findings, Husband asserts he had no family support obligations for this period and is entitled to a true up.

In February 2014, Wife filed a request for an order modifying spousal support and a request for attorney fees, arguing Mulgrew failed to calculate Husband's true income pursuant to the terms of the MSA. The trial court set the matter for a trial and ordered Husband to pay the base amount of family support from March 2014 going forward.

Following a two-day trial, the court issued a statement of decision. The court held that because PHS was a subchapter S corporation, its actual losses could potentially be deducted from Husband's income available for support. However, in consideration of Father's advances to Husband and PHS, the court declined to recognize those losses. The court reasoned: "[A]s long as [Husband] continues to reap the benefit of [Father's]

4

largesse in continuing his business, in paying his bills and in supporting his lifestyle, with no subjective or objective belief that the funds will be repaid those funds cannot be excluded from consideration when it comes to [Husband]'s duty to support his children and his spouse. [¶] [The reason] PHS continues to operate and [Husband] continues to take his $13,000 per month salary, plus additional distributions, is that [Father] provides whatever support is necessary, whenever it is necessary, to do so." The court also held the $27,000 loan to Knapp for a custom car should be added back into Husband's income, but the rest of Husband's loans to Knapp should not. The court concluded Husband's income available for support was the amount of his salary and distributions—$78,528 for the last four months of 2012, and $182,033 for calendar year 2013. The court also held the disparity in the parties' income was sufficient to justify the award of attorney fees under Family Code[3] section 2030.

## II. DISCUSSION

### A. *Standard of Review*

The order at issue concerns the award of family support to Wife, which combines both child and spousal support. (§ 3586.) Child support orders are reviewed for an abuse of discretion (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 282), as are orders modifying spousal support (*In re Marriage of Samson* (2011) 197 Cal.App.4th 23, 29). Under this standard, "Our review is limited to determining whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion. [Citation.] We do not substitute our judgment for that of the trial court, but confine ourselves to determining whether any judge could have reasonably made the challenged order." (*In re Marriage of de Guigne* (2002) 97 Cal.App.4th 1353, 1360.) However, "we must also recognize that determination of a child support obligation is a highly regulated area of the law, and the only discretion a trial court possesses is the discretion provided by statute or rule." (*In re Marriage of Butler & Gill* (1997) 53 Cal.App.4th 462, 465.) Thus, "the trial court's discretion is not

---

[3] All statutory references are to the Family Code.

5

so broad that it 'may ignore or contravene the purposes of the law regarding . . . child support.' " (*In re Marriage of Cheriton*, at p. 283.) To the extent this appeal turns on the interpretation of the MSA, and that interpretation does not require the consideration of conflicting extrinsic evidence, we conduct an independent review. (*Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 556.)

## B. *Husband's Income Available for Support*

Husband contends the trial court erred in finding the advances from Father constituted income available for family support. We conclude we need only resolve the narrower question of whether the trial court abused its discretion in declining to consider Husband's business losses as a reduction of his income available for family support purposes. There was no abuse of discretion, as the losses were fictional and thus did not actually reduce Husband's income available for support.

According to Husband's 2013 income tax returns, he paid himself a salary of $156,000 through PHS. Nevertheless, his taxable income for that year was $0, primarily because he deducted $83,630 in losses from PHS, his subchapter S corporation, on his personal income tax return.[4] But the $83,630 loss is fictional. Through advances, Father covered that loss, plus the amount needed to allow Husband to take salary and distributions. As the trial court found, when it comes to Husband's business, Father "provides whatever support is necessary, whenever it is necessary, to do so." Moreover, allowing Husband to evade his family support obligations based on losses assumed by Father makes little sense in this context, since the losses did not actually reduce Husband's income available for support. (Cf. *Asfaw v. Woldberhan* (2007) 147 Cal.App.4th 1407, 1423–1426 [for the purposes of support payments, income must

---

[4] Husband also deducted an additional $75,984 for alimony, i.e., family support payments. We see no reason why this deduction should also apply to Husband's income available for support. As an initial matter, the DissoMaster calculations attached to the MSA show the parties did not contemplate deducting family support payments from Husband's income available for support. Moreover, allowing such a deduction would be circular, as it would both decrease Husband's support obligations and increase his income available for support.

6

reflect available resources, not fictional financial picture resulting from depreciation deductions].) Because the support payments include child support, the policies underlying the child support statutes are also relevant to our review. Those policies are at odds with allowing parents to pay nothing in child support where they have sufficient income to meet their obligations. (*Id.* at p. 1426; see *In re Marriage of Chakko* (2004) 115 Cal.App.4th 104, 109 [trial court properly rejected husband's attempt to structure his income and expenses to minimize child support obligations].)

Husband argues his business losses had a real impact on his financial situation, since the advances from Father used to cover those losses were loans, not gifts. The trial court found otherwise. Its conclusion was well founded. "Courts are appropriately skeptical of transfers by the parents of one of the parties in a divorce case. 'There is an incentive for both sides of the transfer, the parents making it and the litigant receiving it, to conform their testimony to the disadvantage of the other litigant.' " (*In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1313 (*Williamson*).) Here, Father testified he hoped to get his money back, but indicated he had no intention of demanding repayment. Though Father executed promissory notes in connection with some of the purported loans at issue, those notes do not have any repayment terms and they are not due or payable. Moreover, Father conceded he drew up the $733,000 deed of trust as a precaution in the event Husband filed for bankruptcy, and indicated he was unsure he would ever foreclose on the security, Husband's residence, since he did not want to evict his son and grandchildren from their home. Significantly, the deed of trust was recorded in March 2014, just over a month after Wife filed a request to modify family support and the advances to Husband came under scrutiny. Taking into account the $44,000 promissory note signed in 2014, Husband has borrowed at least $777,000 from Father since 2005. He has yet to repay a penny.[5]

---

[5] Husband also contends we should treat the advances from Father as loans because that is what Wife understood them to be. The argument lacks merit. It is entirely unclear why Wife's understanding of the advances should matter, especially since she was not a party to the transactions. Husband cites two cases in which parental

7

Husband suggests that, under the terms of the MSA, the trial court was required to account for all tax deductions, including those related to his business losses, in calculating Husband's income available for support. Though California courts have gone to great lengths to distinguish taxable income from "actual income," as that term is defined by sections 4053 and 4058 (*Alter*, *supra*, 171 Cal.App.4th 718), Husband argues the parties contractually agreed not to follow this line of authority by including a provision in the MSA defining his income as " 'taxable income of any kind from any business, including but not limited to salary, bonuses, and taxable income reported on K-1 forms.' " However, nothing in the MSA indicates any and all deductions claimed or losses incurred by Husband should reduce his income available for support. Indeed, such an approach would lead to absurd results, as it would allow Husband to use his family support payments, which are tax deductible, to reduce his family support obligations. Even Mulgrew's report, which Husband claims should control the outcome of this appeal, does not mention many of the deductions taken on Husband's individual tax returns. In short, the MSA's use of the term "taxable income" did not preclude the trial court from considering the actual impact of Husband's purported losses.

The distinction between "actual income," as defined by the Family Code, and "taxable income," as defined by the MSA, might have been significant for the purposes of this appeal had the trial court considered nontaxable income, such as from gifts, as

advances were found to be gifts, rather than loans, *Williamson, supra*, 226 Cal.App.4th 1303 and *In re Marriage of Alter* (2009) 171 Cal.App.4th 718 (*Alter*). But neither case suggests a supported spouse's understanding of a parental advance should have any bearing on its treatment as a loan or a gift. Rather, the cases focus on the status of repayment and the parents' expectation of repayment. (*Williamson*, at pp. 1313–1314; *Alter*, at p. 731.)

Husband also argues the MSA establishes the loans from Father were bona fide. We need not consider the contention as it was raised for the first time in the reply brief. In any event, the argument is unpersuasive. The MSA merely states Husband shall indemnify Wife for all debts and obligations owed to Husband's father and brothers, "including all notes payable." Moreover, that Husband convinced Wife to accept an unfavorable division of community property because he assumed the obligation to pay what he represented to be a bona fide loan has no bearing on the legitimacy of that loan.

income available for support. But it did not. The only income considered by the trial court for the purposes of calculating Husband's family support obligations was his salary and personal distributions, both of which are taxable. During the relevant period, Husband also received $300,000 in gifts from Father. The trial court did not consider this money to be income available for support. While the trial court did use the advances from Father to offset Husband's business losses, as discussed above, neither California law nor the MSA prohibit such an approach.[6]

Husband asserts the trial court erred in rejecting Mulgrew's findings, since both parties agreed that Mulgrew, as the jointly appointed accounting expert, would determine Husband's income. We disagree. Mulgrew concluded Husband's net income available for support in 2013 was negative $44,457. He reached this figure by taking the sum of Husband's taxable salary, $156,000, and the "Free Cash Flow from PHS," negative $200,457.[7] The trial court accepted the accuracy "if not the significance" of Mulgrew's figures, noting the substantial difference between the company's performance and the amount Husband took from PHS in salary and distributions. The trial court ultimately declined to consider PHS's negative cash flow for the purposes of calculating Husband's income available for support because Father covered PHS's losses. The court's approach was the correct one. The issue of whether business losses should affect income available for support when those losses are assumed by a third party is a question of law, not accounting. Accordingly, the trial court was not required to defer to Mulgrew's conclusion on this point. Indeed, doing so would have been error, as Mulgrew's analysis

_____

[6] For similar reasons, we reject Husband's contention that the trial court erred in considering the advances from Father because they were irregular and based on need. As Husband points out, gifts may only be considered as income available for support where they " 'bear a reasonable relationship to the traditional meaning of income as a recurrent monetary benefit.' " (*Williamson, supra*, 226 Cal.App.4th at p. 1314.) But in this case, the trial court did not treat the gifts in question as income.

[7] Mulgrew also accounted for personal distributions taken by Husband by deducting them from the free cash flow. Mulgrew performed a similar calculation the last quarter of 2012, the other period at issue, and determined Husband's income available for support for that period was negative $53,460.

9

was contrary to the legal principle that courts should not recognize expenses that do not actually reduce a parent's income available for support. (See *Asfaw v. Woldberhan*, *supra*, 147 Cal.App.4th at pp. 1425–1426.)

Husband argues the trial court's family support order is "self-perpetuating" because it treats the monies "lent" by Father as income available for support, increasing Husband's support obligations, and requiring him to "borrow" even more to meet future family support obligations. Husband asserts he only took money from Father to meet his family support obligations, and that he expected to receive relief from those obligations through the annual retroactive true up. We are not persuaded. As discussed above, the trial court only considered Husband's salary and distributions as income available for support. Moreover, it strains credulity to suggest Father provided the advances at issue solely to offset Husband's family support obligations. Those obligations were only $5,411 to $5,843 per month, and during the relevant period, they amounted to only about one-third of the $300,000 Husband received from Father. Husband conceded at trial this money was used to pay other obligations as well, and Father testified the money was also used for the business. Moreover, Mulgrew's report indicates PHS's operating losses were covered by advances from Husband's family.[8]

According to Husband, the trial court's order compels him to either persuade Father to support him in perpetuity or fall behind in his family support obligations. There is another option. If Husband's taxable income is legitimately reduced, for example, by Father ceasing to support Husband's business and Husband no longer pays himself a salary, Husband may seek a modification of the judgment.[9] But so long as Husband

---

[8] According to Mulgrew, the losses were also covered by the Mechanics Bank credit line. However, the trial court found this loan, like Husband's other debts, might be covered by Father. The court also found Father has "provided whatever is necessary to enable [Husband] to draw his salary plus distributions, and those figures, not the loan from Mechanic's Bank, are the basis for calculating family support."

[9] It is also conceivable that, at one point, Husband's business could earn enough to pay Husband's expenses without Father's support.

10

continues to draw a salary and PHS's losses have no actual effect on Husband's income, Husband must satisfy his family support obligations to his ex-wife and children.

## C. *Attorney Fees*

"Pursuant to Family Code sections 2030 and 2032, the trial court is empowered to award fees and costs between the parties based on their relative circumstances in order to ensure parity of legal representation in the action." (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 974, fn. omitted.) Here, the trial court found that, including her family support payments, Wife's monthly income was $6,000, and Husband's was $16,285. The court concluded this disparity was sufficient to justify a fee award to Wife. Husband argues this was error because his taxable income for the relevant period was zero due to his business losses. But as discussed above, we find the trial court properly declined to consider those losses because they were covered by Father.

## III.  DISPOSITION

The trial court's order awarding family support and attorney fees is affirmed. Wife shall recover her costs on appeal.

_____
Margulies, J.

We concur:

_____
Humes, P.J.

_____
Dondero, J.

11