Filed 9/16/22  Marriage of Regalbuto CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Marriage of SUSAN KAY REGALBUTO and MICHAEL REGALBUTO. | B310897 (Los Angeles County Super. Ct. No. 19STFL14890) |
| SUSAN KAY REGALBUTO, Respondent, v. MICHAEL REGALBUTO, Appellant. | |
| In re Marriage of LOTTE VAN DER VEER and MICHAEL REGALBUTO. | B310917 (Los Angeles County Super. Ct. No. SD031662) |
| LOTTE VAN DER VEER, Respondent, v. MICHAEL REGALBUTO, Appellant. | |

APPEALS from orders of the Superior Court of Los Angeles County, Mark A. Juhas, Judge. Affirmed.

DLA Piper, Justin R. Sarno for Respondent Susan Kay Regalbuto.

Law Office of Herb Fox, Herb Fox and Law Office of Katy Graham, Katy Graham for Respondent Lotte Van Der Veer.

Linda T. Barney and The Law Office of Aaron Leetch, Aaron Leetch for Appellant.

————————————

Appellant Michael Regalbuto challenges orders requiring him to pay the attorney fees of respondent Lotte Van Der Veer under Family Code sections 271 and 6344,[1] and the attorney fees of respondent Susan Kay Regalbuto under sections 2030 and 6344. Lotte and Susan are Michael's former spouses. They separately filed requests for attorney fees following a consolidated trial of their domestic violence restraining orders against Michael, both of which were granted.[2] Michael contends the trial court abused its discretion in finding he had the ability to pay the $400,000 award to Lotte, due in annual installments of $80,000, and the $60,000 award to Susan, due in installments of $5,000 per quarter and a total of $20,000 per year. In particular, Michael claims it was improper for the trial court to consider financial contributions from Michael's parents in determining his ability to pay. Michael also asserts that the fee award to Lotte

_____

[1] All further undesignated section references are to the Family Code.

[2] Although Lotte and Michael do not share a last name, Susan and Michael do. We refer to all parties by their first names in the interest of clarity and intend no disrespect.

2

eliminates his ability to pay the fee award to Susan. We conclude the trial court did not abuse its discretion in considering the sums Michael received from his parents or in finding that Michael has the ability to pay both fee awards. We therefore affirm the trial court's orders.

## BACKGROUND

### A.    Parties

Lotte and Michael married in 2011 and divorced in 2013. They have one daughter, J., who was born in 2012. Michael and Susan married in 2016 and they have one son, M., born in 2017. Michael and Susan separated in 2019 and Susan filed for divorce in December of that year.

### B.    Domestic violence restraining order trial

In November 2019, Lotte and Susan filed separate requests for domestic violence restraining orders (DVRO's) against Michael. Lotte sought protection for herself as well as J., her current husband, and their daughter. Susan sought protection for herself and M. Michael subsequently filed a request for a DVRO against Susan, seeking protection for himself, M., and J.

The trial court ordered Lotte's DVRO petition consolidated with her divorce case and ordered the DVRO petition related to petitions filed by Susan and Michael. The court tried the three DVRO petitions together. Following an 11-day trial, the trial court denied Michael's request for a DVRO against Susan, noting that "there's no question in my mind that [Michael] would be the primary aggressor," and granted the restraining orders requested by Lotte and Susan. The court remarked that "the way a case is tried can be domestic violence," and indicated Michael's theory that the mothers were "conspiring together" against him rose to the level of abuse. The court further characterized the way the

3

case was tried as "a control mechanism from dad's side to try to control these two moms . . . because he desperately wants to run the show."

### C. Lotte's request for attorney fees

In August 2020, Lotte filed a request for attorney fees and costs pursuant to sections 271 and 6344. She asked the court to award all of her fees and costs, totaling $462,520.35, citing Michael's "manifest wrongdoing."

Lotte argued Michael had the ability to pay these fees based on Susan's testimony at the DVRO trial that Michael withdraws approximately $8,000 per month from the trust account of his father, Joseph Regalbuto, as well as Joseph's trial testimony that he paid Michael's attorney fees.[3] Joseph had testified that he did not recall how much he had paid towards Michael's fees in the matter, but it had been "a lot." The trial court later observed it was "really quite apparent" that Joseph was paying his son's attorney fees and that it was surprising that Joseph referred to Michael's attorney as "our attorney."

Michael asserted in response that Joseph had lent him a total of $138,141 over the past eight years (an average of $17,267.63 per year) but had since denied Michael further informal loans. However, Joseph continued to pay an average of $2,000 a month towards Michael's living expenses. Additionally, Michael's mother, Rosemary Regalbuto, had provided Michael with $98,752 in "formal loans" backed by promissory notes between August and October of 2020. Michael's other forms of

---

[3] Susan testified at trial that Michael had access to his parents' trust account in the form of a credit card and checkbook. Further, they had used that account to pay for "everything," including "gym memberships, travel, food, eating out."

4

income up to that point in the year included $12,500 earned through his production company prior to the pandemic, $450 in weekly unemployment compensation, and a one-time stimulus payment of $2,900.

Michael declared that his personal expenses were $2,900 per month, his cash flow was $3,950, and that, beginning in November 2020, he would owe his mother $1,957.11 per month on the promissory notes. His cash flow would therefore be $907.11 short of covering his expenses and loan obligations.[4] He also disclosed that he has child and spousal support obligations totaling $4,280 to Susan.

In her reply, Lotte contended that Michael was not straightforward with the trial court regarding his income and assets. During his divorce proceedings with Lotte in 2013, Michael had claimed he had no interest in any real property. However, Lotte filed grant and quitclaim deeds with the court indicating Michael in fact held a 50 percent interest in the Santa Monica condominium where he was residing at the time. In 2014, he transferred the 50 percent interest to his parents for no consideration.[5]

In the reply and at the hearing on November 2, 2020, Lotte's counsel also asserted that Michael's girlfriend had posted

---

[4] Michael's declaration erroneously states that his cash flow is "$907.11 in *excess* of my $1,957.11 in debt obligations." (Italics added.)

[5] The interest in the condominium was originally transferred to Michael in 2007 from the Regalbuto Living Trust, for which Joseph and Rosemary were identified as trustees. The 2014 quitclaim deed indicated the transfer was a "bonafide gift" and the "grantor received nothing in return."

on her blog about trips that she and Michael had taken together. Michael testified that he and his girlfriend had gone on vacation together and that he had paid $1,000 towards the trip.[6]

The trial court issued its order on November 9, 2020. It found that Michael has substantial loans from his mother that are documented by promissory notes, but observed that the notes all bear zero or 2 percent interest and Michael had not provided "a declaration from either his father or his mother concerning these 'loans.' " The court also found that Michael was able to "fully fund his litigation through his parents" and that Susan "testified that during their marriage the respondent had access to a trust from his father and he was able to remove approximately $8,000 per month," though it acknowledged that Joseph denied this. The court further emphasized that Michael had, until recently, been living rent-free in his parents' Santa Monica condominium.[7] At trial, the court had found the fair market rental value of the condominium to be $5,000 per month.

The court noted "the respondent's financial picture is somewhat muddied," referring to Susan's testimony that in 2019, Pesto Productions, a company owned by Joseph, paid her $32,000, even though she had possibly done only one makeup job

---

[6] The trial court sustained the objections of Michael's counsel to the admission of the blog entries and considered only "those things that [Michael] agreed occurred." The blog posts are not in the record on appeal, but we likewise disregard any representations made concerning their contents and consider only Michael's testimony.

[7] At the time of the hearing, Michael had obtained employment working on a film being produced out of state. He was "staying [in Philadelphia] through the production."

for the company. Susan testified the payment "was a way to pay Michael and avoid being in a higher tax bracket" and "so that Lotte would never know how much money that he was really making to adjust support." The trial court also cited evidence that Michael had transferred his ownership interest in the condominium to his parents during his divorce with Lotte, which was "not explained."

The trial court stated that "[n]either party in this case can afford the fees that have been generated," and the "fee award will no doubt work a financial hardship on the respondent," but found the award would "not impose an unreasonable financial burden on the respondent and it financially impacts the appropriate party." The court concluded, however, that Lotte "brought the DVRO request and as a result would have had some amount of fees in prosecuting the case" and therefore "does bear some responsibility for her fees."

The trial court ordered Michael to pay Lotte $400,000 for her attorney fees, payable in annual installments of $80,000 per year, beginning December 31, 2020. If Michael missed a payment, the remaining balance "shall come due and payable forthwith."

Michael did not make the $80,000 payment due on December 31, 2020. Lotte brought a contempt proceeding against Michael in connection with his failure to pay. The court dismissed the charge on the grounds that Lotte failed to prove Michael's knowledge of the due date for the payment beyond a reasonable doubt since the clerk sent the order to the incorrect email address for Michael's counsel. Michael also did not make the $80,000 payment due on December 31, 2021, though he and

7

his counsel acknowledged the trial court's fee order was a valid order.[8]

---

[8] We grant Lotte's Request for Judicial Notice No. 1 with respect to exhibits E, F, and G, which reflect court records relating to her contempt proceeding against Michael in the trial court for failure to make the December 31, 2020 payment. (Evid. Code, § 452, subd. (d).) We deny her request with respect to exhibits A–D of her Request for Judicial Notice No. 1, which reflect emails from her bank reflecting deposits made by Michael. Even assuming that these records "are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy" (Evid. Code, § 452, subd. (h)), we can take judicial notice only of their existence and content, not the truth of any matters stated therein. Because these emails are relevant only for the truth of Lotte's assertion that Michael failed to make the court-ordered fee payment, judicial notice is inappropriate. (See *Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 882.) We also deny Lotte's Request for Judicial Notice No. 2, which requests that the court take judicial notice of the dockets in two criminal cases in which Michael was convicted of acts of violence. "[T]he appropriateness of a judicial notice request depends on a showing of substantive relevance, as well as procedural admissibility." (*Aquila, Inc. v. Superior Court* (2007) 148 Cal.App.4th 556, 575.) The only issues before us on appeal are (1) whether the appeal should be stayed or dismissed under the disentitlement doctrine because Michael failed to make payments ordered by the trial court and (2) whether there is substantial evidence to support the trial court finding that Michael is able to pay the fees awarded to Lotte and Susan. Michael's prior convictions are not relevant to these questions. We grant Michael's request for judicial notice of court records from the *Regalbuto* matter. (Evid. Code, § 452, subd. (d).)

### D. Susan's request for attorney fees

In October 2020, Susan filed a request for attorney fees and costs in the amount of $130,000. Susan asserted that fees were appropriate under section 6344 and sections 2030 and 2032. In accompanying declarations, Susan asserted that Michael has access to his parents' "$3,300,000+ trust account," from which he withdrew an average of $8,000 per month, whereas she had received her last unemployment check several months prior and intended to file for food stamps and welfare. Susan also stated that Michael had failed to make child support and spousal support payments. Additionally, Susan attached an income and expense declaration from Michael that reported an average monthly income of $2,052 from his production company, whereas her income declaration reported an average monthly income of $416.66 as a freelance makeup artist, though she was unemployed as a result of the pandemic. Susan represented that she intended to begin a job as a homecare worker once she relocated to Oklahoma but did not disclose her anticipated income.

In response, Michael argued Susan had failed to meet her affirmative burden of demonstrating that she cannot afford her own fees, citing the approximately $30,000 in loans she had obtained from her mother, Michael's monthly child and spousal support payments to her totaling $4,280, and her claim that she would soon be employed as a homecare worker. Alternatively, Michael argued that, even if Susan could not afford her fees, he also lacked the ability to pay. Michael challenged Susan's testimony that he withdrew $8,000 a month from the family trust, but conceded that his father pays $2,000 towards his expenses each month. Michael further argued that the $400,000

fee award in Lotte's case eliminated his ability to make any contribution to Susan's fees.

Michael stated in a declaration that his sole sources of income that year were $12,500 earned through his production company prior to the pandemic, $450 in weekly unemployment compensation, and a one-time stimulus payment of $2,900. He represented that Joseph had refused to provide any more loans, but Rosemary had extended a total of $120,397 in loans backed by promissory notes. Michael stated his monthly expenses were now $2,385 per month, and that with a cash flow of $3,950, he was $392.11 short of meeting the $1,957.11 per month loan payment he owed to Rosemary, which would increase to $2,524.85 per month beginning in January 2021. Michael also submitted an updated income and expense declaration in which he stated that he made only an average of $1,130 per month through his production company. He also disclosed that he makes $500 child support payments to Lotte monthly.

Joseph and Rosemary also submitted declarations concerning the money they had provided to Michael. Joseph declared that, of the $138,141 he had loaned to Michael over roughly the past eight years, $50,000 was for the payment of attorney fees ($14,500 in 2019 and $35,500 in 2020). He also stated he had informed Michael in July 2020 that, "despite what [Michael] claimed his needs were, [Joseph] would not be willing or able to loan him any further sums of money," and he had not loaned Michael any money since that time. However, he was continuing to pay "an average of about $2,000" each month towards Michael's expenses and he did not expect to be repaid for these contributions. Although Joseph represented that he expected to be paid back for the loans totaling $138,141 "at some

10

point in the future," he acknowledged that Michael had yet to repay any part of the loans and Joseph had "created no formal terms for him to do so as of this point."

Rosemary stated in her declaration that, "[s]ince July 1, 2020, [she had] provided formal loans, evidenced by written promissory notes," and identified the purpose for which each of the nine loans was made and the history of payments made on each note. Five of the notes, totaling approximately $82,000, were for the purpose of paying attorney fees, while the remaining loans were made for the purposes of covering Michael's support payments and back-owed rent. Rosemary claimed she would allow Michael to be 30 days late on a payment before taking adverse action, but "[o]ther than this exception," she would require Michael to make the monthly payments stated in the notes until they were repaid in full.

In reply, Susan argued that Michael had failed "to disclose an honest accounting of his income and assets," citing his transfer of his 50 percent interest in the Santa Monica condominium to his parents for no consideration, as well as the payment of money from Joseph's production company to Susan.[9] Susan also noted that Michael, while claiming an inability to pay, had taken a vacation with his new girlfriend.[10]

---

[9] Susan attached the deed to the Santa Monica apartment to her declaration, but the court sustained Michael's objections based on lack of foundation and hearsay.

[10] As in Lotte's case, the trial court refused to admit Michael's girlfriend's blog entries in support of these assertions, sustaining Michael's objection on hearsay grounds.

On December 14, 2020, the trial court issued its tentative ruling, in which it noted that "[m]any of the issues in the *Regalbuto* matter are identical to the issues in the *Van der Veer* matter." The court explained that Susan sought fees under sections 6344 and 2030, both of which "rely at least in part, on the ability of [Michael] to pay and on [Susan's] need for fees." The court found that Susan's counsel had failed to put forward the qualifications of each individual that billed in the case and therefore it could award a maximum of approximately $77,000 in fees and costs.

The court rejected Michael's contentions that he "cannot pay any more fees, especially in light of the fact that he owes a significant sum to [Lotte]" and that a fee award in this matter would be "punitive." Rather, the court found that Michael was able to fully fund the litigation through his parents while Susan was unable to do the same. The court cited Susan's testimony that Michael was able to withdraw $8,000 from his father's trust (though it once again recognized that Joseph had denied it), and observed that Michael "was, until very recently (and may still be), living rent free in his parent[s'] Santa Monica condo." The trial court found that Michael's "financial picture remains somewhat muddied," citing Susan's testimony that she was paid a salary during her marriage to Michael "to avoid tax consequences and to hide income from [Lotte]." It also found that, "[w]hile it is a relatively minor sum, [Michael] apparently recently went to Mexico with his current girlfriend . . . while he has not paid his child support to [Susan]," and that Michael therefore "appears to have managed to maintain a lifestyle, while [Susan's] life has been upended."

The trial court observed that Michael had sought a DVRO despite there being "absolutely no evidence that would have supported [his] filing," and concluded that Michael "simply cannot drive [Susan] to financial ruin through his actions and trial strategy and then not pay for some or all of the fees." The court found that, "[a]s was true in *Van der Veer*, neither party can afford the fees that have been generated," and that the "fee award will no doubt work a financial hardship on [Michael]," but the "award will not impose an unreasonable financial burden on [Michael] and it financially impacts the appropriate party," particularly as Susan "is virtually the sole financial and physical support for [M]." However, the court recognized that Susan brought the DVRO request and thus "does bear some responsibility for her fees," though she was "entitled to fees for defending against [Michael's] failed DVRO." It ordered that Michael pay Susan $60,000 in fees and costs at the rate of $20,000 per year, beginning with $5,000 on March 31, 2021, and with $5,000 due quarterly thereafter. If Michael failed to make a payment, the remaining balance would "come due and payable forthwith."

At the hearing on Susan's fee request, Michael requested a statement of decision. On December 28, 2020, Michael filed his "Objections to the Court[']s Ruling of December 14, 2020 (Believed to Be Intended To Be the Court's Tentative Statement of Decision" and "Requests as to the Principal Controverted Issues to Be Addressed by the Final Statement of Decision" under Code of Civil Procedure sections 632 and 634. Michael objected to the ruling on the grounds of omitted findings, including: (1) "specific income, assets, and other financial resources" the court found available to pay Susan's fees as well as those

13

awarded to Lotte; (2) the financial terms on which Michael "can borrow further sums from his parents in order to pay the court-ordered attorney's fees"; (3) whether the court found that "either of [Michael's] parents have an obligation to provide [Michael] money to pay the Court-ordered fees to [Susan] when [Michael's] own income, assets, and other financial resources at his disposal are insufficient to satisfy the Court-ordered payments"; and (4) "the evidentiary basis for the Court's finding that [Susan] does not have the same ability to borrow from her mother that [Michael] has to borrow from his parents." Michael's "Requests as to the Principal Controverted Issues" likewise identified these as the "four principal issues that are material to the Court's decision in its Ruling" and requested that it make findings with respect to these issues. Michael also challenged the court's finding that Susan's mother "does not have the same financial ability as [Michael's] parents" as unsupported. He requested clarification of the "inherent conflict" between the court's findings that neither party could afford the fees that had been generated and that the award would not impose an unreasonable burden on Michael.

The court thereafter confirmed that the December 14, 2020 ruling was its "tentative ruling," though it had originally intended it as the final order. The court provided the parties an additional opportunity to respond to the order before it would consider the matter submitted.

In February 2021, the trial court adopted its tentative as the final ruling and statement of decision with some modifications. The court stated it was not obligated to identify assets for the payment of fees, though it noted that Michael "has been able to fund lengthy litigation, including an unnecessarily

14

long DVRO trial, with two attorneys, through borrowing from his parents," and that "the evidence before the court is that he receives money from a trust." The court found "[i]t is clear that [Michael's] parents have provided significant ongoing funding for the litigation," but declined to make any " 'findings' as to the terms of further loans as the court is unable to do so" and stated it was "not aware of any legal obligation [Michael's] parents have to continue to pay their son's attorney fees." The court also stated that there was no evidence that Susan's mother "has the financial ability to loan the significant attorney fee sums that [Michael's] litigation occasioned." It concluded "[t]he attorney fees in this matter are unreasonably high" and Michael's "actions toward his children and now former spouses caused this expenditure."

Michael timely appealed both orders. On our own motion, we consolidated the appeals for purposes of oral argument and decision.

## DISCUSSION

### I. Disentitlement doctrine

Both Lotte and Susan argue that Michael's appeals should be dismissed or stayed under the disentitlement doctrine for his failure to make payments ordered by the trial court. We decline to exercise our discretion to dismiss or stay the appeals on this ground.

The disentitlement doctrine enables an appellate court to stay or dismiss the appeal of a party who has refused to obey the superior court's legal orders. (*Say & Say v. Castellano* (1994) 22 Cal.App.4th 88, 94.) "Dismissal is not ' "a penalty imposed as a punishment for criminal contempt. It is an exercise of a state court's inherent power to use its processes to induce compliance" '

with a presumptively valid order." (*Ibid.*, quoting *Stone v. Bach* (1978) 80 Cal.App.3d 442, 446.) Thus, the disentitlement doctrine prevents a party from seeking assistance from the court while that party is in "an attitude of contempt to legal orders and processes of the courts of this state." (*MacPherson v. MacPherson* (1939) 13 Cal.2d 271, 277.) "The disentitlement doctrine 'is particularly likely to be invoked where the appeal arises out of the very order (or orders) the party has disobeyed.' " (*Ironridge Global IV, Ltd. v. ScripsAmerica, Inc.* (2015) 238 Cal.App.4th 259, 265.)

Although an appellate dismissal under the disentitlement doctrine typically comes on the heels of the trial court's issuance of a contempt order, a formal adjudication of contempt is not a prerequisite. Rather, "[t]he principle permitting [an appellate] court to . . . dismiss an appeal . . . 'is based upon fundamental equity and is not to be frustrated by technicalities,' such as the absence of a formal citation and judgment of contempt." (*Alioto Fish Co. v. Alioto* (1994) 27 Cal.App.4th 1669, 1683; accord, *Blumberg v. Minthorne* (2015) 233 Cal.App.4th 1384, 1391 [appellant violated two postjudgment orders and appeal was dismissed]; *Gwartz v. Weilert* (2014) 231 Cal.App.4th 750, 757–758 ["No formal judgment of contempt is required under the doctrine of disentitlement . . . . An appellate court may dismiss an appeal where the appellant has willfully disobeyed the lower court's orders or engaged in obstructive tactics."].)

Lotte invokes the doctrine in connection with the fee order that is the subject of Michael's appeal in her case. She argues the appeal should be dismissed or stayed until Michael makes the $80,000 payment that was due December 31, 2020. Lotte's contempt claim against Michael for his failure to make a

16

payment on December 31, 2020 was dismissed. She did not bring contempt proceedings against him in connection with his purported failure to make the payment due on December 31, 2021. Susan argues that Michael's appeal should be dismissed because he has failed to make child support payments, a separate order from the one Michael appeals in her case. Although the trial court's order stated that Michael had failed to make payments in its order awarding fees to Susan, the record before us does not indicate whether Susan brought a contempt proceeding concerning Michael's failure to pay child support. However, the absence of a formal contempt finding in both cases does not end our analysis.

"Courts do not lightly apply the disentitlement doctrine. A party's obstruction of, or failure to comply with, trial court orders must be willful." (*Findleton v. Coyote Valley Band of Pomo Indians* (2021) 69 Cal.App.5th 736, 756, accord, *Tobin v. Casaus* (1954) 128 Cal.App.2d 588, 592 ["The right to an appeal must not be lightly forfeited, and where a doubt exists as to a litigant's conduct being contumacious or willful, an appellate court will tolerate temporarily the acts which were disruptive of the judicial process."].) We may have cause to doubt that Michael was unaware of his obligation to make a fee award payment at the time of the contempt proceeding, and Michael concedes that he did not make the full payment owed. We also recognize that "the merits [of the appeal] are irrelevant to the application of the disentitlement doctrine." (*Ironridge Global IV, Ltd. v. ScripsAmerica, Inc., supra,* 238 Cal.App.4th at p. 266, citing *Stone v. Bach, supra,* 80 Cal.App.3d at p. 448.) However, we can neither overlook that the crux of these appeals is Michael's claimed inability to pay the fee awards, nor conclude without

17

doubt that Michael's failure to make the fee payments owed to Lotte was willful.

With respect to the child support payments owed to Susan, Michael raises a factual dispute as to whether he was in violation of the child support order at the time he went on vacation with his girlfriend, as the trial court suggested in its order. He further argues there is no evidence in the record that he was delinquent in his payments after that point in time. On this ambiguous record, we decline to take the drastic step of depriving Michael of the right to an appeal.

Further, the cases on which Lotte and Susan rely that dismissed an appeal under the disentitlement doctrine did not rely entirely upon nonpayment of a money judgment or order to pay money. These include, for example, *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, in which the appellant had been found in contempt of court for failing to pay sanctions *and* was also the subject of a bench warrant for his arrest due to his failure to report to jail (*id.* at pp. 166–167), and *Stone v. Bach*, *supra*, 80 Cal.App.3d 442, in which the appellant, after the dissolution of a partnership, failed to deposit partnership monies into a bank account or to directly pay one-half to his former partner *and* was twice found to be in contempt of court, including for refusing to be sworn for examination as a judgment debtor. (*Stone*, at pp. 443–444.) While we do not condone Michael's failure to fulfill court-ordered obligations, his conduct in these cases has not yet been so extreme.

We conclude this is not " 'one of the rare cases where applying this doctrine is appropriate due to [the appellant's] flagrant[, repeated and continuous] violation of the [superior] court's orders' " (*Findleton, v. Coyote Valley Band of Pomo*

18

*Indians, supra,* 69 Cal.App.5th at p. 740, second and third alterations in original), and therefore proceed to the merits of the appeals.

## II.    Award of fees to Lotte under section 271

Michael contends the trial court abused its discretion in awarding Lotte $400,000 for her attorney fees under section 271 because it improperly "imput[ed] income to Michael on the assumption that Michael's parents will provide him additional financial assistance to pay Lotte's attorney's fees." We conclude that the court's reliance on past financial contributions from Joseph and Rosemary was not inappropriate and that substantial evidence supports the court's award of fees. We therefore find no abuse of discretion.

### A.    Legal standard

Section 271, subdivision (a), provides that "the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys." Section 271 "is aimed at conduct that frustrates settlement of family law litigation. Expressed another way, section 271 vests family law courts with an additional means with which to enforce this state's public policy of promoting settlement of family law litigation, while reducing its costs through mutual cooperation of clients and their counsel." (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1318.)

A party moving for relief under section 271 need not "show harm as a prerequisite to an award of sanctions." (*In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1480.) However, an

19

award of sanctions under section 271 must be "tethered to attorney fees and costs." (*Menezes v. McDaniel* (2019) 44 Cal.App.5th 340, 351.) Although the statute plainly requires that the award be based upon attorney fees and costs related to a party's conduct that frustrates the policy of promotion of settlement, "the party seeking sanctions pursuant to section 271 need not establish with great precision an amount directly caused by the improper conduct. [Citation.] In part, this flexibility exists because the misconduct may increase attorney fees in ways that are indirect and difficult to prove." (*Sagonowsky v. Kekoa* (2016) 6 Cal.App.5th 1142, 1155–1156.)

Michael does not challenge the trial court's determination that his conduct at the DVRO trial was sanctionable under section 271. Rather, Michael argues that he is unable to pay the $400,000 sanction imposed.

Any order that requires a party to pay attorney fees under the Family Code requires the court to "first determine that the party has or is reasonably likely to have the ability to pay." (§ 270.) Section 271 requires the court to "take into consideration all evidence concerning the parties' incomes, assets, and liabilities," and prohibits the court from making an award "that imposes an unreasonable financial burden on the party against whom the sanction is imposed." (§ 271, subd. (a).) In determining ability to pay, a past or present cash deficit is not controlling. (*Rosenthal v. Rosenthal* (1961) 197 Cal.App.2d 289, 297–298.) It is the appellant's burden to show that the sanctions created an unreasonable burden.

"Sanction orders under section 271 are . . . reviewed under the abuse of discretion standard. [Citation.] Applying the abuse of discretion standard, we consider de novo any questions of law

20

raised on appeal, but will uphold any findings of fact supported by substantial evidence." (*In re Marriage of Smith* (2015) 242 Cal.App.4th 529, 532 (*Smith*).) "Discretion is abused when its exercise is arbitrary, whimsical, or capricious." (*In re Marriage of Battenburg* (1994) 28 Cal.App.4th 1338, 1343.) A trial court's order awarding sanctions pursuant to section 271 " ' "will be overturned only if, considering all the evidence viewed most favorably in support of its order, no judge could reasonably make the order." ' " (*In re Marriage of Burgard* (1999) 72 Cal.App.4th 74, 82.)

### B. The trial court did not err in considering funds from Michael's parents

Michael contends the trial court abused its discretion in relying in part on past loans from his parents in determining his ability to pay under section 270 because they have no obligation to pay Lotte's fees. We conclude the purported loans were relevant "evidence concerning the parties' incomes, assets, and liabilities." (§ 271, subd. (a).) The trial court did not err by considering the payments from Michael's parents in determining whether he has an ability to pay.

*Smith*, *supra*, 242 Cal.App.4th 529, is instructive. *Smith* addressed whether a court could consider funds paid on a spouse's behalf in determining the relative circumstances of the parties when awarding attorney fees under section 2030. In *Smith*, the trial court ordered the wife to pay the attorney fees of the husband and the husband's current wife, in an amount exceeding $270,000, minus an unspecified offset to the husband. (*Id.* at p. 531.) The wife's father had paid all of her attorney fees in the dissolution and child custody proceedings, which totaled " 'close to $400,000.' " The father testified that he intended to

21

continue financing his daughter's litigation.  (*Id*. at p. 534.)  The trial court considered the funds the father paid to the wife's attorneys in deciding to award attorney fees and costs to the husband and his current wife.  (*Id*. at pp. 531–532.)  The Court of Appeal affirmed the order, concluding the trial court did not abuse its discretion in considering the father's "regular, substantial infusions of cash as part of its determination of the relative circumstances of the respective parties and their ability to maintain or defend the proceedings," even though the payments "were characterized as 'loans' to [the wife] and memorialized in promissory notes."  (*Id*. at p. 534.)

In response to the wife's argument that she did not have access to her father's wealth for the purpose of paying anyone else's attorney fees, the court reasoned that "[t]his circumstance . . . does not distinguish the funds [the wife] received from her father from any other source of income: ' "Few, if any, sources of income are certain to continue unchanged year in and year out. . . ." . . . [¶] . . . It is irrelevant that there is no legal obligation on the part of the donor to continue making the gifts . . . .' [Citation.]"  (*Smith*, 242 Cal.App.4th at p. 535.)  The court therefore concluded that "[t]he trial court acted within its discretion by rejecting [the wife's] plea of poverty for purposes of apportioning the overall cost of the litigation equitably between the parties."  (*Id*. at p. 535.; see also *Kevin Q. v. Lauren W.* (2011) 195 Cal.App.4th 633, 647 [trial court did not abuse its discretion in considering a party's receipt of regular, recurrent monetary gifts from her father in determining her need for attorney fees].)

This case similarly involves regular and substantial infusions of cash from Michael's parents.  Joseph has provided "informal loans" averaging $17,267.63 per year for eight years,

though the actual amount paid in any given year was not disclosed in the record. Additionally, after Joseph purportedly denied Michael any further loans around July 2020, he obtained loans exceeding $98,000 from his mother, Rosemary, over a three-month period in 2020. Though the *Van der Veer* record does not include an explanation of what portion of these payments went towards Michael's fees, substantial evidence supports the conclusion that Michael's parents have contributed significant sums for that purpose, including Joseph's trial testimony and promissory notes specifically titled "attorney fees."

We recognize that the wife's father in *Smith*, *supra*, 242 Cal.App.4th 529, 534, testified that he expected that "the 'loans' would be repaid, if at all, as an offset against [the wife's] inheritance," and that there is no equivalent testimony from Michael's parents in this case. However, the trial court appeared to discredit the evidence that the substantial amounts Michael received from his parents were not gifts, referring to them as " 'loans,' " and noting there were no declarations from Michael's parents concerning the loans. Michael concedes that the trial judge's use of quotations "impl[ied] that he was skeptical that these were legitimate loans." This skepticism is not unfounded. Indeed, "[c]ourts are appropriately skeptical of transfers by the parents of one of the parties in a divorce case. 'There is an incentive for both sides of the transfer, the parents making it and the litigant receiving it, to conform their testimony to the disadvantage of the other litigant. Transfers where the parents would never have sought repayment, if the marriage had remained intact, may be viewed from a different perspective when the marriage falls apart.' [Citation.]" (*In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1313.) Though the

appeal before us is not from spousal and child support orders, as in *Williamson*, there is a similar incentive here for Michael and his parents to conform their testimony to the disadvantage of Lotte and Susan. Viewing the record in the light most favorable to the order, we presume that the trial court viewed the loans either as gifts or as unlikely to be enforced on the terms set forth in the promissory notes with Rosemary, similar to the loans in *Smith*.

*In re Marriage of Schulze* (1997) 60 Cal.App.4th 519 does not compel a different conclusion. In *Schulze*, the trial court ordered a noncustodial father to pay his former wife's attorney fees in the amount of $7,500, "payable in full 'forthwith.' " (*Id*. at p. 530.) The Court of Appeal concluded the amount of the award was appropriate given the relative circumstances of the parties, but the provision for full and immediate payment was based on an erroneous presumption that the father could obtain the money from his parents because they previously "had lent him about $8,000 to pay his own fees." (*Id*. at p. 531.) In reversing the attorney fee award, the court noted that "[c]harity, once extended, is still not an entitlement." (*Id*. at p. 532.) However, *Schulze* involved a relatively small, one-time loan by the father's parents. In contrast, a parent's "regular, substantial infusions of cash" may properly be considered as part of the relative circumstances of the parties for the purpose of determining an attorney fee or cost award. (*Smith*, *supra*, 242 Cal.App.4th at p. 534.)

Finally, Michael also argues that *Smith* is distinguishable because the court focused its analysis on whether it was appropriate to award fees under section 2030, rather than section 271, and that the purpose of section 2030 "is distinct from the

24

purpose of [section 271]." This is true. The court in *Smith* stated that "[m]uch of the reasoning above would, on its face, apply equally to a section 271 analysis," but recognized "that section 271 has a quite different purpose from that of section 2030, and somewhat different language," and therefore left "the question of whether these differences make a difference for another day." (*Smith, supra,* 242 Cal.App.4th at p. 536.)

We find that the differences between awards under section 2030 and section 271 do not alter the analysis under the circumstances of this case. "The purpose of section 2030 is to ensure parity. 'The idea is that both sides should have the opportunity to retain counsel, not just (as is usually the case) only the party with greater financial strength.' " (*In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1056.) Section 271 "advances the policy of the law 'to promote settlement and to encourage cooperation which will reduce the cost of litigation.' " (*In re Marriage of Petropoulos* (2001) 91 Cal.App.4th 161, 177.) The ability of a party to " 'litigate[ ] [the opposing party] out of the case,' by taking advantage of their disparate financial circumstances" is as contrary to the purpose of encouraging cooperation under section 271 as it is to the purpose of section 2030. (*Smith, supra,* 242 Cal.App.4th at p. 534.)[11]

---

[11] Payment of an award under section 2030 may be ordered "from any type of property, whether community or separate, principal or income" (§ 2032, subd. (c)), whereas an award under section 271 "is payable only from the property or income of the party against whom the sanction is imposed, except that the award may be against the sanctioned party's share of the community property." (§ 271, subd. (c).) These differences have little salience here.

## C. Substantial evidence supported Michael's ability to pay

Michael also contends the record lacks sufficient evidence to support the trial court's determination that he had the ability to pay. He asks us to discredit "questionable" and "uncorroborated" evidence the trial court cited in its order. We will not substitute our judgment for that of the trial court with respect to the credibility of evidence and conclude substantial evidence supported the trial court's finding that Michael has an ability to pay.

The loans from Joseph and Rosemary, described above, were not the only evidence supporting the trial court's conclusion that Michael has an ability to pay. Michael acknowledges that Joseph pays an average of $2,000 a month towards Michael's expenses, notwithstanding his refusal to extend further loans. Michael also reported income from his production company, unemployment payments, and a stimulus payment, totaling approximately $17,000 as of October 2020.

The trial court also referenced the fact that Michael has been able to live "rent free in his parent[s'] Santa Monica condo" in the order. There was evidence that Michael has lived "on and off, for seven, eight years" in a Santa Monica condominium owned by his parents, for which he pays only the association fee of $540 per month, though the trial court found that its fair market rental value was $5,000 per month. The trial court also cited Susan's testimony that Michael was able to withdraw approximately $8,000 a month from his parents' trust account to cover the couple's expenses. In a declaration filed below, Michael denied that he had access to funds other than those specifically listed, though he did not directly address Susan's claims

26

regarding the trust. Joseph, on the other hand, affirmatively disputed that Michael had "access to any of [his] accounts" at the DVRO trial, as the trial court recognized in its order.[12] Based on its conclusion, however, we presume the trial court ultimately found Susan's testimony to be more credible. Such credibility determinations are the exclusive province of the trial court. (*Hawkins v. City of Los Angeles* (2019) 40 Cal.App.5th 384, 393 [credibility is the exclusive province of the trier of fact].) Contrary to Michael's suggestion, it was not an abuse of discretion for the trial court to base its finding that Michael is able to access these funds on Susan's "uncorroborated" testimony. "[T]he testimony of a single witness is sufficient to uphold a judgment even if it is contradicted by other evidence, inconsistent or false as to other portions." (*People v. Leigh* (1985) 168 Cal.App.3d 217, 221.)

Michael also contends there was insufficient evidence to support this finding because the trial court stated at the DVRO trial that Susan's testimony on the $8,000 per month trust income was "not good solid evidence." However, earlier in the same sentence, the trial court stated, "I think the evidence of $8,000 a month is probably by a preponderance I think it's there . . . ." Michael does not argue that a higher burden of proof than preponderance of the evidence applied to the trial court's determination of ability to pay, nor do we find any support for such a claim. (See Evid. Code, § 115 ["Except as otherwise provided by law, the burden of proof requires proof by a

---

[12] Joseph's testimony was somewhat more equivocal with respect to whether Michael had ever written a check from the trust account. Joseph stated, "I have no idea. I doubt it. I don't see how he could do that."

preponderance of the evidence."].)  Further, "[w]e presume the trial court knew and properly applied the law absent evidence to the contrary."  (*McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1103.)  The "probably" or "I think" in the trial court's statement at the DVRO trial does not demonstrate that the trial court relied on evidence that did not meet the applicable burden of proof when deciding the fee order.

We also reject Michael's contention that an award of this size could only be the result of passion or prejudice.  We do not construe the trial court's reference to Michael's transfer of his interest in the Santa Monica condominium to his parents during his divorce with Lotte as an indication that it "includ[ed] the value of Michael's parents' condominium as an asset from which Lotte's $400,000 in attorney's fees can be paid."  As we have noted, we presume the trial court applied the relevant law absent evidence to the contrary.  Thus, we will not conclude that the court improperly found Michael was an owner of the condominium without the requisite clear and convincing proof (Evid. Code, § 662), and we do not rely on the value of the condominium in concluding there was substantial evidence supporting the trial court's ruling.  It appears the trial court raised the transfer as evidence that led it to question the credibility of Michael's representations regarding his finances.  Indeed, immediately after referencing the transfer, the trial court observed that Michael's financial picture was "somewhat muddied."[13]

---

[13] We similarly reject Michael's contention that the order's mention of Susan's testimony that she received a payment of $32,000 from Joseph's production company in 2019 as a means of

We recognize that a $400,000 award, payable in installments of $80,000 per year, is substantial. The trial court itself stated that "[n]either party in this case can afford the fees that have been generated" and that "[t]his fee will no doubt work a financial hardship on the respondent." However, the trial court was aware of and applied the relevant law, recognizing that an award of fees under section 271 must take into account "the ability of the respondent to pay." Interpreting the court's observations in the light most favorable to the ruling, it is clear that Michael would not be able to afford the expenses on his employment and unemployment income alone. Nevertheless, as discussed, the trial court was justified in taking into consideration the substantial funds provided by both his parents, Joseph's regular contributions of $2,000 towards monthly Michael's expenses, and Michael's ability to withdraw $8,000 per month from the family trust. Although the trial court recognized that the award is burdensome, it determined the "award will not impose an unreasonable financial burden on the respondent." We cannot conclude that, " ' "considering all the evidence viewed most favorably in support of [the] order, no judge could reasonably make the order." ' " (*In re Marriage of Burgard, supra,* 72 Cal.App.4th at p. 82.)

Having concluded that the trial court's award of fees to Lotte under section 271 was not an abuse of discretion, we need

---

providing money to Michael without Lotte's knowledge was "inflammatory but irrelevant surplusage." As with the evidence of the condominium transfer, this testimony was evidence bearing on the credibility of Michael and his parents, and thus relevant to the court's conclusion. Nor do we find any implication that the trial court assumed Michael would receive $32,000 on a yearly basis, as Michael suggests in his reply brief.

not decide whether an award of fees would also be proper under section 6344.  (See *Smith*, *supra*, 242 Cal.App.4th at p. 536 [declining to decide whether fees were proper under § 271 where it had determined they were proper under § 2030]; *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 ["[I]f a judgment is correct on any theory, the appellate court will affirm it regardless of the trial court's reasoning."].)

## II.    Award of fees to Susan under sections 2030 and 6344

Michael challenges the trial court's award of attorney fees to Susan under sections 2030 and 6344 on similar grounds as Lotte's award under section 271, though he further argues that the fee award to Lotte eliminates his ability to pay Susan.  We conclude the trial court's finding that Michael also had the ability to pay the fee award to Susan was supported by substantial evidence, and therefore affirm.

### A. Legal standard

Section 6344 authorizes a court to award fees to the prevailing party in a proceeding under the Domestic Violence Protection Act (DVPA, §§ 6200–6219).  Section 6344, subdivision (b) provides: "In any action in which the petitioner is the prevailing party and cannot afford to pay for the attorney's fees and costs, the court shall, if appropriate based on the parties' respective abilities to pay, order that the respondent pay petitioner's attorney's fees and costs for commencing and maintaining the proceeding.  Whether the respondent shall be ordered to pay attorney's fees and costs for the prevailing petitioner, and what amount shall be paid, shall be determined based upon (1) the respective incomes and needs of the parties, and (2) any factors affecting the parties' respective abilities to pay."

30

An award of fees may be made under section 2030 "[i]n a proceeding for dissolution of marriage, nullity of marriage, or legal separation of the parties." (§ 2030, subd. (a).) However, an award of fees under section 2030 entails substantially similar considerations as an award under section 6344. "When a request for attorney's fees and costs is made, the court shall make findings on whether an award of attorney's fees and costs under this section is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties. If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs." (§ 2030, subd. (a)(2); accord, *In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 112 ["award of 'reasonably necessary' fees and costs" to a party is mandatory if trial court finds disparity in access to funds to retain counsel and other party can pay both parties' legal representation].) "Section 2030 is (and always has been) controlled and supplemented by section 2032. Under section 2032, '[t]he court may make an award of attorney's fees and costs under Section 2030 . . . where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties.' " (*Kevin Q. v. Lauren W., supra,* 195 Cal.App.4th at p. 640.)[14]

Because both section 2030 (as supplemented by section 2032) and section 6344 "require a *comparative analysis* of the

[14] An additional difference between section 2030 and section 6344 is that section 6344 requires a party be designated as the prevailing party while section 2030 does not. However, the record is clear that Susan is the prevailing party, and Michael does not challenge that determination.

31

parties' circumstances and/or needs and serve the common purpose (shared by all the Fam. Code statutes that authorize attorney fee awards) of ensuring, 'to the extent possible, that the litigating parties are on an equal footing in their ability to present their cases,' " we examine the propriety of the award under both statutes together. (*Kevin Q. v. Lauren W., supra*, 195 Cal.App.4th at p. 643 [court did not err in relying on § 2032 for guidance with respect to other Fam. Code fee provisions that focus on " '*respective* incomes and needs' " and " '*respective* abilities to pay' "].) Under both, we review an award of fees for abuse of discretion. (*Loeffler v. Medina, supra*, 174 Cal.App.4th at p. 1509 [§ 6344]; *In re Marriage of Bendetti* (2013) 214 Cal.App.4th 863, 868 [§ 2030].)

We must also consider that the trial court issued a statement of decision, which may affect the scope of appellate review. "A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness. [Citations.] [¶] Sections 632 and 634 [of the Code of Civil Procedure] (both as amended in 1981) set forth the means by which to avoid application of these inferences in favor of the judgment. When the court announces its tentative decision, a party may, under section 632, request the court to issue a statement of decision explaining the basis of its determination, and shall specify the issues on which the party is requesting the statement; following such a request, the party may make proposals relating to the contents of the statement. Thereafter, under section 634, the party must state any objection he may have to the statement in order to avoid an implied finding on appeal in favor of the prevailing party. The section declares that if omissions or ambiguities in the statement are timely

brought to the trial court's attention, the appellate court will not imply findings in favor of the prevailing party. The clear implication of this provision, of course, is that if a party does not bring such deficiencies to the trial court's attention, that party waives the right to claim on appeal that the statement was deficient in these regards, and hence the appellate court will imply findings to support the judgment." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133–1134, fns. omitted.)

"Even where proper procedure under sections 632 and 634 has been followed punctiliously, '[t]he trial court is not required to respond point by point to the issues posed in a request for statement of decision. The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case.' [Citations.] 'When this rule is applied, the term "ultimate fact" generally refers to a core fact, such as an essential element of a claim.' [Citation.] 'Ultimate facts are distinguished from evidentiary facts and from legal conclusions.' [Citation.] Thus, a court is not expected to make findings with regard to 'detailed evidentiary facts or to make minute findings as to individual items of evidence.' " (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 983.)[15] Where an issue was not identified as controverted under

---

[15] Michael requested a statement of decision at oral argument on December 10, 2020, though the trial court had yet to issue a tentative order. On December 28, 2020, Michael simultaneously filed a request identifying the principal controverted issues under Code of Civil Procedure section 632 and filed objections under section 634, thus collapsing the two steps into one. However, as Susan has raised no objections to the process and the trial court had "the opportunity to clarify or

Code of Civil Procedure section 632, the appellate court will imply findings in favor of the judgment and will consider whether substantial evidence supports those findings. (*Id.* at pp. 984–985.)

### B. The trial court did not abuse its discretion in finding a disparity of access to funds

In comparing the parties' access to funds, the trial court found that Michael "has been able to fully fund his litigation through his parents," while Susan has left Los Angeles in part "due to the fees expended in prosecuting and defending [the] DVRO litigation," for which she borrowed money from her mother. The court further found that "[t]here is no evidence that [Susan's] mother has the financial ability to loan the significant attorney fee sums that [Michael's] litigation occasioned." The court also noted that Michael "apparently recently went to Mexico with his current girlfriend," which indicated to the court that Michael has "managed to maintain a lifestyle, while [Susan]'s life has been upended." These findings are supported by the record.

The record also indicates that, as of October 2020, Susan had received her last unemployment check several months prior and intended to file for food stamps and welfare. Additionally, while Michael reported an average monthly income of $2,052 from his production company in July 2020 and of $1,130 in November 2020, Susan reported an average monthly income of

---

supplement its statement of decision before losing jurisdiction" (*Thompson v. Asimos, supra,* 6 Cal.App.5th at p. 983), we accept that the procedure was appropriately followed and will not imply findings as to the controverted issues specifically identified by Michael.

34

only $416.66 as a freelance makeup artist, though she was unemployed as a result of the pandemic. It is unclear what Susan will earn as a homecare worker when she relocates to Oklahoma.

"The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested. Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances." (§ 2032, subd. (b).) Though Susan has received $29,500 from her mother in loans for living expenses and attorney fees, there is a clear disparity between the sum Susan obtained from her mother and the $236,893 Michael's parents have provided him over a period of years. Nor is there any evidence in the record that Susan's mother has regularly contributed to her expenses as Joseph and Rosemary have for Michael. The trial court did not abuse its discretion in finding there was a disparity in the parties' ability to pay, notwithstanding the money Susan has received from her mother.

## C. The trial court did not abuse its discretion in finding that Michael has the ability to pay under sections 2030 and 6344

Michael contends "[t]he simple math using the evidence in the record most favorable to Susan establishes Michael does not have the ability to pay this fee order along with the preceding one in favor of Lotte and the child and spousal support orders the same judge made in favor of Susan." This is true only if the equation does not consider Michael's parents' payment of his

35

attorney fees and other obligations. We conclude, as we did with respect to the award to Lotte, that the trial court did not abuse its discretion in considering these sums in awarding fees under sections 2030 and 6344.

The record indicates that Michael's financial situation at the time of the second fee order was largely the same as at the time of the first, with the notable exception of the $400,000 award to Lotte, payable in installments of $80,000 per year. Taken together with the trial court's fee award to Susan, Michael's yearly fee obligation is $100,000. Michael also has spousal and child support obligations to Susan and Lotte exceeding $50,000. When his monthly expenses of $2,385 are also taken into account, Michael's yearly expenses exceed $180,000. Michael's income from his parents' trust, employment income, unemployment payments, and the one-time stimulus payment, plus Joseph's monthly contributions of $2,000, total approximately $140,000.[16] Thus, whether the purported loans

---

[16] Michael asserts that the $2,000 monthly payments from Joseph should not be considered because they were not referenced in the trial court's statement of decision. As discussed above, Michael identified as a controverted issue the "specific income, assets, and other financial resources" available for the payment of fees. The trial court stated that it was "not obligated to identify assets for the payment of the fees," and generally described some of Michael's resources, including financial contributions from his parents and trust income. We agree that the trial court was not required "to make findings with regard to 'detailed evidentiary facts or to make minute findings as to individual items of evidence.'" (*Thompson v. Asimos, supra*, 6 Cal.App.5th at p. 983.)

36

from Michael's parents, which exceeded $150,000 in 2020, were properly considered as part of his ability to pay is central to our determination of whether the trial court abused its discretion in finding Michael was able to pay both awards.

Though we concluded above that the trial court did not abuse its discretion in considering those payments in connection with the fee award to Lotte under section 270, Michael raises additional challenges in connection with the award to Susan.

Michael contends that attorney fees paid on his behalf by his parents cannot be counted as income because he is not free to use that money towards other expenses, such as the fee award. Michael cites *M.S. v. O.S.* (2009) 176 Cal.App.4th 548, in which the appellate court held the trial court "abused its discretion by including the tribe's payment of [the support obligor's] attorney fees in his gross annual income under section 4058, subdivision (a) for purposes of the guideline support calculation." (*Id.* at p. 557.) However, even in the child support context, courts have rejected an "absolute rule" that "gifts are not income for purposes of calculating support payments." (*In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 731.)

Moreover, unlike in *M.S. v. O.S., supra,* 176 Cal.App.4th 548, where the obligor received no benefit from the tribe unless attorney fees were incurred (*id.* at p. 557), it appears that a considerable portion of the money Michael has received from his

---

Michael further argues in his reply that it "would not make sense that Michael's father paid him $2,000 a month for living expenses if Michael was also taking $8,000 from his parents' trust." Michael does not cite any authority for this position. Regardless, whether the income attributed to Michael is approximately $140,000 or approximately $120,000, as Michael urges, the outcome is the same.

parents was not paid directly to his attorneys.  According to Joseph's declaration in the *Regalbuto* record, Joseph directly paid $50,000 to Michael's lawyers, meaning that loans he provided to Michael totaling more than $88,000 were unrelated to attorney fees.  Similarly, according to Rosemary's declaration, four of the nine promissory notes, totaling approximately $37,000, were for purposes unrelated to attorney fees

Further, Michael does not argue that a child support award under section 4058 has the same or a comparable purpose as an attorney fee award under section 2030.  Indeed, though he relies on *M.S. v. O.S.*, *supra,* 176 Cal.App.4th 548, Michael seeks to undermine the ruling in *Smith*, *supra*, 242 Cal.App.4th 529, on the ground that it relies in part on child support cases in reaching its conclusion.  (See *Smith*, at pp. 534–535.)  We acknowledge that the purposes underlying section 4058 and section 2030 are distinct.  (See *Anna M. v. Jeffrey E.* (2017) 7 Cal.App.5th 439, 451 [a "child support calculation . . . involves policy objectives different from those involved in a fee award"].)  However, even if it relied on reasoning from the distinguishable context of child support awards, we agree with the court in *Smith* that excluding substantial attorney fee payments made by Michael's parents "from consideration would vitiate one of the primary purposes of section 2030 and section 2032, to prevent one party from being able to 'litigate[] [the opposing party] out of the case,' by taking advantage of their disparate financial circumstances.  [Citation.]"  (*Smith*, at p. 534.)

Unlike in the *Van der Veer* matter, where Michael conceded that the trial court was skeptical about whether the loans were legitimate, Michael argues with respect to the award to Susan that the trial court affirmatively "found that the payment of

Michael's attorney fees by his parents were loans rather than gifts." However, it is not clear that the trial court had shed its skepticism, though it did not refer to the loans from Joseph and Rosemary as "loans." The trial court stated "[Michael] claims that all the money he received from his parents are loans," but did not state that it accepted Michael's characterization. Indeed, the court noted the informality of the purported loans from Joseph, and referenced the "very favorable rates" attached to the sums from Rosemary. The trial court also subsequently stated, "One thing is clear, [Michael] has had a constant source of fees from his parents, *loans or no*." (Italics added.) This language suggests the trial court continued to doubt Michael's characterization of these funds, notwithstanding Joseph's and Rosemary's declarations. The record supported such doubts.[17] Viewing the court's statements in the light most favorable to the order, we conclude that the reasoning in *Smith*, *supra*, 242 Cal.App.4th 529, applies equally to Susan's fee award as to Lotte's, particularly as the fee award to Susan was made under section 2030, the same code section under which the award was made in *Smith*.

---

[17] For example, despite Michael's disclosure in his October 2020 declaration that he expected to be $900 short of the monthly loan payments due under the promissory notes beginning November 2020, Rosemary provided him with additional loans totaling $21,644 over the next month. In November 2020, Michael represented that, by January 2021, his loan obligations to his mother would reach $2,524.85, or nearly two-thirds of his monthly cash flow of $3,950. The trial court might fairly question why Rosemary would continue to extend loans under such circumstances if she had a genuine expectation of repayment under the terms of the promissory notes.

Michael also argues that the payments made by his parents, other than Joseph's monthly payments of $2,000, were not a recurrent payment of a fixed amount, and thus should not be considered income. He relies on *In re Marriage of Williamson*, *supra*, 226 Cal.App.4th 1303, a case concerning spousal and child support payments, in which the court found that payments the husband's parents made to him were not income because, for the most part, they "were made upon request, depending upon the family's need." (*Id.* at p. 1314.) The court distinguished these payments from the monthly payments of $6,000 made by the husband's mother in *In re Marriage of Alter*, *supra*, 171 Cal.App.4th 718. (*Williamson*, at p. 1314.) However, "more important[]" than this, in the *Williamson* court's view, was that "[the husband's] parents are no longer making the advances," citing testimony of the husband's father. (*Id.* at p. 1315.) As we have noted, although Joseph declared he would not make any further loans, Rosemary has continued to provide Michael with large sums of money to cover his obligations and has not indicated she is unwilling to continue to do so.

Further, there was no indication in *Smith*, *supra*, 242 Cal.App.4th 529, that the payments made by the wife's father were of a fixed amount. Rather, the court focused on the father's testimony that "on a monthly or bimonthly basis, [he] regularly received a bill from [the wife's] attorneys for her litigation expenses." (*Id.* at p. 534.) The declarations from Joseph and Rosemary similarly reflect monthly and bimonthly payments of fees and of support obligations on Michael's behalf.

In sum, we conclude the trial court did not err in considering Joseph's and Rosemary's payments as income to Michael or as a circumstance significantly increasing his ability

40

to pay.[18]  We do not find that the trial court's order was without basis in the record or was punishment for Michael's conduct and the expense of the litigation, as Michael contends.  We therefore conclude there was no abuse of discretion in the trial court's analysis of Michael's ability to pay under sections 2030 and 6344.

---

[18] Though *M.S. v. O.S., supra,* 176 Cal.App.4th 548, is distinguishable on the grounds discussed above, we note that the appellate court in that case acknowledged that the tribe's payment of the obligor's attorney fees was a factor that could warrant an upward adjustment from the guideline amount, even if it could not be considered as income.  (*Id.* at p. 557.)

## DISPOSITION

The orders are affirmed.  Lotte and Susan are awarded their costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


ADAMS, J.*


We concur:



EDMON, P. J.



LAVIN, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.